593 A.2d 1177

CARPET REMNANT WAREHOUSE, INC., PETITIONER-
APPELLANT, v. NEW JERSEY DEPARTMENT OF
LABOR, RESPONDENT-RESPONDENT.

Argued March 11, 1991—Decided August 6, 1991.

568

*Steven E. Angstreich* argued the cause for appellant (*Levy, Angstreich, Finney, Mann & Burkett*, attorneys; *Frederick W. Hardt*, on the brief).

*Lewis A. Scheindlin*, Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo*, Attorney General of New Jersey).

The opinion of the Court was delivered by

STEIN, J.

The issue in this appeal is whether carpet installers who provided services for Carpet Remnant Warehouse, Inc. (CRW) are employees or independent contractors for purposes of the Unemployment Compensation Law, *N.J.S.A.* 43:21–1 to –24.4 (UCL). Pursuant to the UCL, the carpet installers are deemed employees unless they are able to satisfy the criteria of the so-called "ABC test," *N.J.S.A.* 43:21–19(i)(6)(A), (B), (C). If the installers are unable to meet the ABC test's criteria, then CRW is liable for unpaid unemployment compensation and temporary-disability contributions attributable to those installers. Although the Office of Administrative Law (OAL) determined that the installers are independent contractors, the Commissioner of the New Jersey Department of Labor (Commissioner) ruled that the installers did not satisfy the ABC test and therefore are employees. The Appellate Division affirmed in

an unreported opinion. We granted certification, —— *N.J.* ——
(19 ), and now reverse.

I

In July 1986, the New Jersey Department of Labor (Depart-
ment) conducted a "routine, periodic test audit" of CRW. The
Department auditor, Dudley Wilson, reviewed CRW's individual
wage records, periodic payroll records, cash disbursements, tax
returns, and related bookkeeping records for the calendar years
1982, 1983, 1984, 1985, and the first quarter of 1986. In the
course of the audit, the auditor interviewed Raymond Schien-
holtz, CRW's president; Norman Cohen, CRW's accountant;
and Wayne Neill, one of the carpet installers who provided
services to CRW. The Department concluded that thirty-nine
of the carpet installers who had provided services to CRW for
the audit period were "non-bonafide independent contractors"
or, more precisely, employees pursuant to the UCL. According-
ly, the Department demanded that CRW pay an assessment of
$16,276.50 plus interest for delinquent unemployment and dis-
ability contributions due for the audit period and attributable to
those installers. Ordinarily, both the employer and the employ-
ee make contributions to the Unemployment Compensation
Fund, the employee's share being deducted from his wages.
*N.J.S.A.* 43:21–7. However, if the employer fails to deduct the
employee's share of contributions, the employer alone is liable
for those contributions. *N.J.S.A.* 43:21–7(d)(1)(D).

CRW disputed the assessment, and the Department referred
the matter to the OAL for disposition as a contested case. At
the OAL hearing in January 1988, CRW attempted to prove
that the carpet installers were independent contractors under
the ABC test, which provides:

(6) Services performed by an individual for remuneration shall be deemed to
be employment subject to this chapter (R.S. 43:21–1 et seq.) unless and until it is
shown to the satisfaction of the division that:

(A) Such individual has been and will continue to be free from control or
direction over the performance of such service, both under his contract of
service and in fact; and

(B) Such service is either outside the usual course of the business for which
such service is performed, or that such service is performed outside of all the
places of business of the enterprise for which such service is performed; and

(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business. [*N.J.S.A.* 43:21–19(i)(6).]

Most of the relevant facts elicited from testimony at the hearing before the Administrative Law Judge (ALJ) are undisputed. At the time of the hearing, CRW had been in business for twenty years and had two retail locations, one in Burlington and one in Haddon Heights. During that twenty-year period, no installer had filed a claim for either unemployment or disability benefits. Both stores use the name Burlington Carpet and sell carpeting and area rugs. In its advertisements, CRW quotes both installed and uninstalled prices for its carpeting. Approximately sixty percent of its carpet sales include installation.

When CRW transacts a sale of carpeting that includes installation, it charges the customer an aggregate price, which includes the retail price of the carpeting and a charge for installation that is equal to or five percent greater than CRW's cost (the installer's fee). When the carpeting is available, CRW schedules the installation date with the customer. CRW then posts notice of the installation job on a calendar board in its warehouse. One of a pool of qualified installers selects that job and then installs the carpeting at the customer's residence or place of business. Although CRW has experimented with having installers on its payroll, that practice proved to be unsuccessful because of the seasonal nature of the business.

Training and experience are required before one can become a qualified carpet installer. Typically, a novice installer will apprentice with an experienced installer for three to five years. After the apprenticeship, the installer submits his qualifications and price schedule to carpet retailers that are in the market for new installers. CRW ordinarily accepts only those installers whose prices and qualifications it deems appropriate and who submit proof of insurance. CRW also maintains its own liability insurance.

Once approved, installers obtain work by selecting installation jobs from CRW's calendar board, usually on the basis of

the installer's geographical preference. CRW does not guarantee any installer a set volume of work, nor are installers obligated to take specific jobs or perform a specified volume of work. Some installers devote a substantial percentage of their time to installations for CRW, but none works for CRW exclusively. On average, installers provide services for three to five different carpet retailers.

After an installer selects a job, he generally has no contact with the customer until the date of installation other than to call the customer to confirm the appointment. On the designated day, the installer picks up the carpeting from CRW's warehouse, transports it to the designated place of delivery, and performs the installation. The installer provides at his own expense all the equipment and supplies required for installation, including a vehicle, adhesive glue, staple-guns, rollers, tape, a power stretcher, and nails. On occasion, the customer will ask the installer to perform extra work. In those instances, the customer pays the installer directly for the incremental services. Otherwise, the customer pays CRW the total cost of the carpeting and installation.

Although installers negotiate their fees with CRW, the rates they charge do not vary significantly. The cost of a job usually is determined by multiplying the number of square yards by the installer's rate. An added charge may be assessed for custom work. Installers submit invoices directly to CRW, and CRW pays the installer even if the customer fails to pay CRW. Approximately seventy-five percent of the installers use CRW's standard invoice form, which CRW provides at its expense in order to facilitate its record-keeping. CRW does not withhold any taxes from the installers' fee.

CRW guarantees the carpeting and installation for one year. Customers generally complain to CRW directly about any problems with an installation. After receiving a complaint, CRW contacts the installer who performed the work, and that installer is then obligated to repair any defects at his own expense.

If the installer disputes the veracity of the complaint, then CRW or the installer communicates with A & M Inspection, an independent company that investigates complaints and prepares reports detailing any defects. In the event that the customer does not wish the original installer to perform the necessary repairs, CRW sends out a different installer and subtracts the cost of repair from the first installer's payment. If the first installer is insolvent or no longer available, CRW bears the cost of repair.

Two installers, Jerry Forcellini and Thomas Johnston, testified at the hearing. Forcellini is the sole or majority stockholder of Jerry Forcellini Carpet Company, Inc., the entity through which he operates his carpet-installation business. He testified that his company employs three helpers, paying the necessary taxes and insurance for those employees. He owns two trucks, each with the name of his company displayed on it. According to Forcellini he is well-known and does little advertising. Forcellini testified that he had been a carpet installer for thirty years and had served as an apprentice for four years. His company installs, services, repairs, and sells carpeting, and approximately twenty percent of its income is derived from sales of carpeting. The percentage of Forcellini's business that is derived from CRW installations varies from year to year. In 1982, the company received approximately $50,000 from installation for CRW, which constituted approximately thirty to forty percent of its gross revenue for that year. Forcellini installs carpeting for four or five carpet retailers other than CRW.

Johnston, who has been an installer for seventeen years, operates as a sole proprietorship under the name Johnston's Carpeting Service. In addition to installing carpeting for CRW, Johnston installs carpeting for several other carpet retailers, decorators, and individual consumers. He occasionally sells carpeting. Johnston testified that he employs a helper, for whom he pays the required taxes and insurance. Johnston has his own business card, letterhead, and invoices. His advertising is limited to the local shoppers' guide or the placement of

his business card on the bulletin boards of carpet distributors who do not offer installation. Johnston and Forcellini testified that although CRW is an integral part of their business, they prefer to work free-lance and not exclusively for CRW. They testified that working for several retailers rather than one increases their independence and is also more profitable than working full-time for one store.

Wilson, the Department auditor, also testified at the hearing. In addition to reviewing CRW's tax and employment records, Wilson checked the yellow pages to determine if any of the installers advertised their services. He found that few did so. Wilson testified that his review of the Department's "Alpha Search" system revealed that most of the installers in question were not listed as employing units. Conceding that in certain circumstances a carpet installer could be an independent contractor, Wilson acknowledged that he did not attribute employee status to a substantial number of installers who provided services for CRW during the audit period. He excluded installers that were either employing units, incorporated, or earned less than a thousand dollars from CRW, apparently not considering the A or B aspects of the ABC test in making those determinations. Wilson also stated that an installer who installed carpet for other carpet retailers and derived less than seventy-five percent of his revenue from CRW would be considered "independently established," thereby satisfying the C standard.

In May 1988, the ALJ issued his decision ordering that the Department's claim against CRW be denied. The ALJ found CRW's witnesses to be "believable and persuasive," and adopted their testimony. Although finding the Department's auditor to be credible, the ALJ did not find his testimony persuasive. The ALJ determined that installers "operate independently of retailers in all respects of their activities." The ALJ then reviewed the applicable statutory and case law, concluding that CRW had established each prong of the ABC test, *N.J.S.A.* 43:21–19(i)(6), and that therefore CRW's relation-

ship with its installers was exempt from classification as employment.

In August 1988, the Commissioner rejected the ALJ's conclusion, finding that the installers were employees of CRW. The Commissioner accepted the ALJ's fact-findings concerning the relationship between CRW and its installers. The Commissioner also accepted the ALJ's determinations of credibility, but found those determinations irrelevant. Although noting his acceptance of the ALJ's finding that the carpet industry considers installers to be independent contractors, the Commissioner determined that "that perception is not legally binding." The Commissioner found the factual circumstances in this case indistinguishable from those in *Irvington Linoleum & Carpet v. Department of Labor*, OAL Docket No. LID 6278–87 (1988), an earlier decision in which an ALJ had determined that carpet installers were employees. The Commissioner then proceeded to analyze CRW's relationship with its installers under the ABC test, concluding that CRW had not satisfied either the A (control) or B (course-of-business or location-of-work) standard for any of the installers. Furthermore, the Commissioner held that with the exception of Forcellini and Johnston, CRW had not satisfied the requirements of the C (independent-business) standard. The Commissioner affirmed the Department's assessment against CRW for all the installers.

The Appellate Division affirmed the Commissioner's decision. The court found sufficient credible evidence in the record to support the Commissioner's conclusion that "the installers were not free from [CRW's] control under subsection A" of the ABC test. The court found as indicia of control that CRW sets the time and date for installation, guarantees the quality of installation, and bears the risk of loss if a customer fails to pay. Because the court held that CRW failed to meet its burden of proof under the "control" standard, it declined to reach either the B or the C standard of the ABC test.

## II

### —A—

Unemployment legislation was first enacted in this country in the 1930s in response to the overwhelming amount of unemployment resulting from the Depression. *See Charles C. Steward Mach. Co. v. Davis*, 301 *U.S.* 548, 586–87, 57 *S.Ct.* 883, 81 *L.Ed.* 1279, 1290–91 (1937). Although a number of states had proposed such legislation, and a few had adopted unemployment statutes, *id.* at 587–88, 57 *S.Ct.* at 890–91, 81 *L.Ed.* at 1291, the federal government's enactment of the Social Security Act in 1935 provided the impetus for widespread unemployment-compensation legislation. *Ibid.* See *Act of August 14, 1935*, ch. 531, 49 *Stat.* 620, 640 (1935) (codified as amended at 26 *U.S.C.A.* §§ 3301 to 3311). The significance of the Social Security Act was that its provisions affording a credit for state unemployment taxes against the federal tax imposed by that legislation alleviated the fear of states that imposing an unemployment tax on their industries would create an economic disadvantage with neighboring states. *Charles C. Steward Mach. Co., supra*, 301 *U.S.* at 588–89, 57 *S.Ct.* at 891–92, 81 *L.Ed.* at 1291–92. By August 1937, all of the states and territories and the District of Columbia had enacted unemployment-compensation laws. Note, *Employment Relationships Within the Scope of State Unemployment Compensation Statutes*, 1 *Wash. & Lee L.Rev.* 232, 233 n. 5 (1940).

The Social Security Act applied to employers of eight or more employees, *see Social Security Act, supra*, § 907, 49 *Stat.* at 642, and required them to pay an "excise tax" based on a percentage of wages. *Id.* § 901, 49 *Stat.* at 640. An employer could receive a credit of up to ninety percent of that tax if the employer's home state satisfied certain criteria relating to the administration of the state's unemployment compensation law and thereby was certified by the Social Security Board. *Id.* §§ 902–03, 42 *Stat.* at 640–41. Other than those criteria, states had great latitude regarding the parameters of their unemploy-

ment-compensation laws. Witte, *The Essentials of Unemployment Compensation*, 25 *Nat'l Mun.Rev.* 157, 162 (1936).

One aspect of state unemployment statutes that generated considerable litigation was the varying definition of "employee" under the different statutes. Comment, *Interpretation of Employment Relationship under Unemployment Compensation Statutes*, 36 *Ill.L.Rev.* 873, 873 (1942). Under the Social Security Act, "employment" was defined as any service performed by an employee, excluding seven enumerated types of service. *Social Security Act, supra*, § 907(c), 42 *Stat.* at 643. Although the Social Security Act did not specifically define "employee,"[1] courts and administrative agencies interpreted the term to be synonymous with the common-law definition of "servant." *Comment, supra*, 36 *Ill.L.Rev.* at 874–75. Under the common law, the distinction between a servant and an independent contractor turned on the degree of control exercised by the employer over the "means, methods, and details of operation." *Id.* at 874; *see Indian Ref. Co. v. Dallman*, 31 *F.Supp.* 455, 456 (S.D.Ill.1940), *aff'd*, 119 *F.*2d 417 (7th Cir. 1941). The *Restatement of Agency* sets forth a comprehensive test for the servant-independent contractor distinction, considering among others, the following factors:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

---

[1] The federal law has since been amended to define an employee as, with certain exceptions, "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 *U.S.C.* § 3121(d). For a discussion of current federal law on the distinction between employees and independent contractors, see Ness, *Independent Contractors: Tax Risks and Rewards, A.B.A. Barrister,* Spring 1991, at 51.

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer; and

(i) whether or not the parties believe they are creating the relationship of master and servant. [*Restatement of Agency* § 220 (1933).]

A minority of states adopted the federal definition of employee. Comment, *supra*, 36 *Ill.L.Rev.* at 875–76. The vast majority, however, adopted some form of the ABC test. *Id.* at 876 n. 16. A majority of states continue to use the ABC test, but some have amended their statutes to conform with the federal law. Although the ABC test's criteria are derived from common-law principles, see *Restatement of Agency, supra*, § 220, the actual origin of the test is unclear. Those states that had adopted the ABC test were divided on whether to interpret the test broadly, thereby granting unemployment coverage to a greater number of workers, or narrowly, covering a smaller number of workers. Comment, *supra*, 36 *Ill.L.Rev.* at 878 n. 18. Those states that had construed the ABC test broadly based their interpretation primarily on the remedial purpose of unemployment legislation. *Id.* at 879. Courts that had construed the test narrowly did so on the ground that the ABC test merely codified common-law principles. *Id.* at 878.

—B—

In New Jersey the Unemployment Compensation Law as originally introduced was similar to the Social Security Act in that it did not contain the ABC test. See *S.* 215, 160 Legis. (February 10, 1936). However, the bill that became law a little more than ten months later, *L.*1936, *c.* 270, included the ABC test, as does the present statute. See *N.J.S.A.* 43:21–19(i)(6)(A), (B), (C). When first enacted, the UCL contained seven specific types of services that were excluded from the definition of employment. See *L.*1936, *c.* 270, § 19(i)(7). The Legislature

has continuously expanded the specific exclusions, which now number twenty-five. See *N.J.S.A.* 43:21–19(i)(7).

■■ Before reviewing the relevant statutory and case law regarding the ABC test, we note that the primary objective of the UCL is to provide a cushion for the workers of New Jersey "against the shocks and rigors of unemployment." *Provident Inst. for Sav. in Jersey City v. Division of Employment Sec.*, 32 *N.J.* 585, 590, 161 *A.*2d 497 (1960); *accord Trauma Nurses, Inc. v. Board of Review*, 242 *N.J.Super.* 135, 141, 576 *A.*2d 285 (App.Div.1990); *see N.J.S.A.* 43:21–2. Because the statute is remedial, its provisions have been construed liberally, permitting a statutory employer-employee relationship to be found even though that relationship may not satisfy common-law principles. *Provident Inst. for Sav. in Jersey City, supra*, 32 *N.J.* at 590, 161 *A.*2d 497; *Gilchrist v. Division of Employment Sec.*, 48 *N.J.Super.* 147, 153, 137 *A.*2d 29 (App.Div.1957).

■■ The ABC test becomes applicable only after a determination that the service provided constitutes "employment," which is defined as "service * * * performed for remuneration under any contract of hire, written or oral, express or implied." *N.J.S.A.* 43:21–19(i)(1)(A). If the Department determines that the relationship falls within that definition, and is not statutorily excluded, *see N.J.S.A.* 43:21–19(i)(7), then the party challenging the Department's classification must establish the existence of all three criteria of the ABC test. *See Electrolux Corp. v. Board of Review*, 129 *N.J.L.* 157, 159, 28 *A.*2d 209 (E & A 1942) (*Electrolux Corp.* II); *Gilchrist, supra*, 48 *N.J.Super.* at 157, 137 *A.*2d 29. Conversely, the failure to satisfy any one of the three criteria results in an "employment" classification. That determination is fact-sensitive, requiring an evaluation in each case of the substance, not the form, of the relationship. *See Provident Inst. for Sav. in Jersey City, supra*, 32 *N.J.* at 591, 161 *A.*2d 497; *Trauma Nurses, supra*, 242 *N.J.Super.* at 142, 576 *A.*2d 285; *Schomp v. Fuller Brush Co.*, 124 *N.J.L.* 487,

490–91, 12 *A.*2d 702 (Sup.Ct.1940), *aff'd,* 126 *N.J.L.* 368, 19 *A.*2d 780 (E. & A.1941).

A determination that the relationship between a business and a person providing services to that business is "employment" has two significant consequences. First, the employer and the employee must contribute a specified percentage of the employee's wages to the Unemployment Compensation Fund. *N.J.S.A.* 43:21–7. Second, one who is classified an employee rather than an independent contractor may collect unemployment benefits, if otherwise eligible and not otherwise disqualified. *See generally N.J.S.A.* 43:21–4 (eligibility conditions); *N.J.S.A.* 43:21–5 (disqualification criteria). Thus, the ABC test is used not only to determine those employers and employees that are obligated to pay unemployment-compensation taxes but also as one of the standards of eligibility to determine those workers eligible to receive unemployment benefits.

Part A of the test requires a showing that the provider of services "has been and will continue to be free from control or direction over the performance of such services." *N.J.S.A.* 43:21–19(i)(6)(A). The person must establish not only that the employer has not exercised control in fact, but also that the employer has not reserved the right to control the individual's performance. 81 *C.J.S. Social Security and Public Welfare* § 169, at 317 (1977); *see also Schomp, supra,* 124 *N.J.L.* at 491, 12 *A.*2d 702 (noting that employer retained right to control in its contract). One commentator has suggested that part A is "no more than an adoption of the common-law control test," Comment, *supra,* 36 *Ill.L.Rev.* at 877, which classifies as an independent contractor one who renders services but retains control over the manner in which those services are performed, agreeing only to accomplish results. *See Restatement of Agency, supra,* § 220 comment c.

An employer need not control every facet of a person's responsibilities, however, for that person to be deemed an employee. In *Schomp, supra,* 124 *N.J.L.* 487, 12 *A.*2d 702, the

court found that a person (termed a "dealer" in his contract) who sold merchandise for Fuller Brush Company (Fuller) was not free from Fuller's control. Under his contract, the "dealer" purchased merchandise from Fuller at wholesale prices and resold that merchandise in a specific territory. Although the relationship appeared on the surface to be one of vendor-vendee, the court found that in reality the dealer was a salesman who could sell the merchandise only in a given area and was subject to dismissal on failure to sell a given amount of merchandise. *Id.* at 490, 12 *A.*2d 702. Other indicia of control included sales training given by branch managers of the company and weekly sales assistance to the dealers. *Id.* at 491, 12 *A.*2d 702. See also *William H. Goldberg & Co. v. Division of Employment Sec.*, 21 *N.J.* 107, 121 *A.*2d 12 (1956) (*Goldberg*) (insurance salesperson permitted to solicit business only for his employer and provided with cards and literature held not free from control); *Electrolux Corp. v. Board of Review*, 129 *N.J.L.* 154, 28 *A.*2d 207 (E. & A.1942) (*Electrolux Corp.* I) (vacuum cleaner salespersons who could not vary from company's operating procedures, were closely supervised, and were subject to termination held not free from control); *Superior Life, Health & Acc. Ins. Co. v. Board of Review*, 127 *N.J.L.* 537, 23 *A.*2d 806 (Sup.Ct.1942) (*Superior Life*) (insurance salesperson prohibited from deviating from sales procedures, provided with sales assistance, and prohibited from working for competitors found to be under company's control).

In a significant recent case, the Appellate Division held that nursing professionals were free from control of an employment broker (TNI) that placed the nurses in hospitals and other health-care organizations on a temporary basis. See *Trauma Nurses, supra,* 242 *N.J.Super.* 135, 576 *A.*2d 285. The Board of Review (Board) had determined that the nurses were under the direction and control of TNI because the nurses' employment required them to perform certain services and because TNI paid the nurses weekly. *Id.* at 141, 576 *A.*2d 285. The Appellate Division rejected the Board's conclusion as unsup-

ported by the record, instead finding substantial evidence supporting the contention that the nurses were free from control. The court found determinative that the nurses were free to choose where and when to work, including working for other brokers or independently, that they were not obligated to comply with any rules, practices, or procedures set by TNI, that TNI exercised no supervision over the nurses, that TNI provided no training, that TNI furnished no supplies, equipment, or uniforms, that TNI did not provide any fringe benefits, and that the nurses were responsible for their own insurance coverage. *Id.* at 144–45, 576 *A.*2d 285.

■ Part B of the ABC test is satisfied by a showing either that the services performed are outside the employer's usual course of business or that the service is performed outside of all of the employer's places of business. *N.J.S.A.* 43:21–19(i)(6)(B). The common law treated the B standard's two alternative factors as pertinent, but not decisive, in distinguishing between employees and independent contractors. *See Restatement of Agency, supra*, § 220(e), (h). The regulations issued pursuant to the Social Security Act also consider those factors to be relevant but not determinative. *See Rev.Rul.* 87–41, 1987–1 C.B. 296. Under New Jersey's statute, however, satisfaction of either of the B standard's alternatives is a prerequisite for avoiding designation as an employee. *See N.J.S.A.* 43:21–19(i)(6)(B). See Note, *Statutory Construction—Unemployment Compensation Act—Derogation Rule*, 1941 *Wis.L.Rev.* 269, 273 (observing that ABC test transformed factors in B standard from consideration to requirement).

The meaning of the phrase "outside the usual course of business" is elusive. *See* Comment, *supra*, 36 *Ill.L.Rev.* at 877 (finding phrase "confusingly vague"). A review of our case law reveals little to illuminate the meaning of the B standard's first alternative. *See, e.g., Goldberg, supra*, 21 *N.J.* at 114, 121 *A.*2d 12 (conclusory finding that insurance salesperson's activities were within usual course of business of insurance compa-

ny); *Superior Life, supra,* 127 *N.J.L.* at 540, 23 *A.*2d 806 (same); *see also Trauma Nurses, supra,* 242 *N.J.Super.* at 147, 576 *A.*2d 285 (court found that providing health-care services was "clearly beyond the purview and usual course of TNI's business" of brokering health-care personnel). The B standard's second alternative has proved to be less problematic. *See, e.g., id.* at 147–48, 576 *A.*2d 285 (finding that because nurses did not work in TNI office, they worked outside of all of TNI's places of business); *Empire Theatre, Inc. v. Unemployment Comp. Comm.,* 136 *N.J.L.* 254, 255, 55 *A.*2d 238 (Sup.Ct. 1947) (finding "obvious" that seasonal performers in burlesque theatre did not work "outside of all the places of business" of their employer), *aff'd,* 137 *N.J.L.* 301, 59 *A.*2d 623 (E. & A.1948); *Schomp, supra,* 124 *N.J.L.* at 491, 12 *A.*2d 702 (accepting concession that door-to-door salespersons performed services outside employer's places of business); *see also* Comment, *supra,* 36 *Ill.L.Rev.* at 877 (suggesting that salespersons may work "outside of all the places of business" of their employer); *see also Goldberg, supra,* 21 *N.J.* at 114, 121 *A.*2d 12 (insurance solicitor who "reported daily" to employer's office and performed some activities there did not work outside all of employer's places of business); *Superior Life, supra,* 127 *N.J.L.* at 540, 23 *A.*2d 806 (court found business of enterprise located at no fixed place but rather wherever services were to be performed).

■ Part C of the ABC test is also inherited from the common law. *See Restatement of Agency, supra,* § 220(b). In *Gilchrist,* the court concluded that the requirement that a person be customarily engaged in an independently-established trade, occupation, profession, or business "calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." 48 *N.J.Super.* at 158, 137 *A.*2d 29. Thus, if the person providing services is dependent on the employer, and on termination of that relationship would join

the ranks of the unemployed, the C standard is not satisfied. *See Goldberg, supra,* 21 *N.J.* at 114, 121 *A.*2d 12; *Bloom v. Division of Employment Sec.,* 69 *N.J.Super.* 175, 179–80, 174 *A.*2d 16 (App.Div.1961); *Gilchrist, supra,* 48 *N.J.Super.* at 159, 137 *A.*2d 29; *Superior Life, supra,* 127 *N.J.L.* at 540, 23 *A.*2d 806; *Schomp, supra,* 124 *N.J.L.* at 491, 12 *A.*2d 702; *see also Electrolux Corp.* I, *supra,* 129 *N.J.L.* at 157, 28 *A.*2d 207 (finding the C criterion had not been established). Conversely, the C standard is satisfied when a person has a business, trade, occupation, or profession that will clearly continue despite termination of the challenged relationship. *See, e.g., Trauma Nurses, supra,* 242 *N.J.Super.* at 148, 576 *A.*2d 285 (most nurses worked for other brokers and hospitals and could obtain varying types of work, including full-time, part-time, and shift work); *Chmizlak v. Levine,* 20 *N.J.Misc.* 339, 27 *A.*2d 629 (Dep't Labor 1942) (nurses found to be engaged in independently-established profession).

Although this is the first case in this state concerning whether carpet installers should be classified as employees or independent contractors, other jurisdictions have considered that and related issues. In *Pam's Carpet Service v. Employment Division,* 46 *Or.App.* 675, 613 *P.*2d 52 (1980), the court applied Oregon's statutory employment test, which includes only the A and C standards of the New Jersey test, to carpet installers. It concluded that because the carpet retailer could control where, but not how or when, the installers performed services, the installers satisfied the first standard. *Id.* at 680–82, 613 *P.*2d at 55; *cf. Mississippi State Tax Comm'n v. Bates,* 567 *So.*2d 190 (Miss.1990) (carpet installers held to be independent contractors under common-law "control" test). Regarding whether the installers were customarily engaged in independent businesses, the Oregon court held that installers could be classified as independent contractors, considering as a relevant factor, among others, the extent to which an installer is economically dependent on that particular retailer. 46 *Or.App.* at 682–86, 613 *P.*2d at 56–57; *see also Mont.Code Ann.* 39–51–204(n)

(1989) (statutory exemption from employment classification for carpet installers who meet certain criteria); *cf. Department of Employment v. Brown Bros. Constr.*, 100 *Idaho* 479, 600 *P.*2d 783 (1979) (loggers held to be free from control and engaged in independent business and therefore independent contractors); *North Am. Builders v. Unemployment Comp. Div.*, 22 *Utah* 2d 338, 453 *P.*2d 142 (1969) (siding installers held to be independent contractors under ABC test). *But cf. Larsen v. Department of Employment*, 106 *Idaho* 382, 679 *P.*2d 659 (1984) (pipe removers who did not require particular skill or training and did not supply their own equipment were not engaged in independently-established business and were therefore employees); *New Sleep v. Department of Employment Sec.*, 703 *P.*2d 289 (Utah 1985) (part-time waterbed installers were not customarily engaged in independently-established trade and were therefore employees).

### III

 That appellate review of an administrative agency's determination is circumscribed is a well-established principle, the reviewing court being required to defer to the agency's fact-findings if supported by the record. *Clowes v. Terminix Int'l*, 109 *N.J.* 575, 587, 538 *A.*2d 794 (1988); *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.*2d 753 (1965). Although an agency's interpretation of a statute is entitled to some weight, that interpretation is not binding. *Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973). In this case, because the Commissioner accepted the ALJ's fact-findings and determinations of credibility, we need only determine whether the Commissioner properly applied the ABC test to the undisputed facts.

 We note preliminarily that since the adoption of the UCL, the Legislature has continually expanded the number of exclusions from statutory "employment." See *supra* at 581, 593 *A.*2d at 1184. Among those persons excluded are "home-to-

home salespersons * * * whose remuneration consists wholly of commissions," *N.J.S.A.* 43:21–19(i)(7)(O), an exclusion that presumably would apply to the persons in *Schomp v. Fuller Brush Co., supra,* 124 *N.J.L.* 487, 12 *A.*2d 702, and *Electrolux Corp.* I, *supra,* 129 *N.J.L.* 154, 28 *A.*2d 207; and non-industrial insurance agents, *N.J.S.A.* 43:21–19(i)(7)(J). In removing home-to-home salespersons whose remuneration consists wholly of commissions from the scope of the statute, the Legislature explained that "such individuals are independent contractors not subject to the Federal Social Security Act, and such commissions * * * can form no practical basis for the ultimate payment of benefits." Statement, *L.*1964, *c.* 111; *see also* Statement, *L.*1941, *c.* 385 (identical legislative purpose stated for excluding non-industrial insurance agents). Those statements accompanying the continued expansion of the exclusions from statutory employment evince a clear legislative intent to include within the classification of employment only those individuals that may someday be eligible for unemployment benefits. *Cf. Brambila v. Board of Review,* 124 *N.J.* 425, 440, 591 *A.*2d 605, 613 (1991) ("unemployment benefits are a type of insurance available * * * to eligible individuals who have lawfully worked * * * and contributed to the unemployment insurance fund"). One should not be required to make unemployment contributions unless one realistically could be eligible to collect benefits.

To be eligible for such benefits, in addition to establishing a statutory "employment" relationship, a claimant must not be "engaged in full-time work," *N.J.S.A.* 43:21–19(m)(1), and must have suffered involuntarily at least a twenty-eight-percent drop in his average weekly wage. *See N.J.S.A.* 43:21–3(b), (c)(1); *see also N.J.S.A.* 43:21–19(u) (defining "average weekly wage"). A further requirement is proof that the claimant be "actively seeking work." *N.J.S.A.* 43:21–4(c). Hence, any carpet installer who earns less than twenty-eight percent of his income from CRW would not be eligible for benefits on being terminated by CRW. An installer who earns greater than that percentage of his income from CRW would have to show that although he has

sought work from other carpet retailers, no suitable work is available. *See Worsnop v. Board of Review*, 92 *N.J.Super.* 260, 265, 223 *A.*2d 38 (App.Div.1966). Hence, it is unlikely that an installer who either derives an insubstantial amount of his business from CRW or is qualified to perform services for other retailers would be eligible to collect unemployment benefits.

We recognize, however, that circumstances may arise in which a person clearly ineligible to collect unemployment benefits may nevertheless be unable to satisfy one of the standards of the ABC test. For example, an independent contractor whose business derives ten percent of its revenues from services provided to one enterprise will not be eligible to collect unemployment benefits if that enterprise goes out of business, the loss in revenue being insufficient to satisfy the statutory eligibility requirements. See *N.J.S.A.* 43:21–3. Even if that independent contractor has clearly satisfied the C standard, he or she may not satisfy the A standard under the Commissioner's expansive interpretation of the phrase "free from control," and therefore could be obligated to contribute to the Unemployment Compensation Fund. Such a result may be in conflict with the legislative purpose that the tax be imposed only on those workers realistically eligible to apply for unemployment benefits.

In our view, the C standard provides the closest connection between the obligation to pay taxes and the eligibility for benefits. An independent contractor whose business or trade continues to provide an adequate income despite the loss of a major customer will neither need unemployment benefits nor be eligible to receive them. But the contractor's prior relationship with the lost customer may preclude the contractor from satisfying the A or B standard of the ABC test, rendering the contractor liable for unemployment contributions even though the contractor will never benefit from those payments. That result is imposed because of the statutory A and B standards, which are not necessarily consistent with a person's realistic

eligibility for benefits. Resolution of that potentially anomalous result of the ABC test's application is for the Legislature, and is not the function of this Court. We note, however, that in cases in which satisfaction of the C standard convincingly demonstrates a person's ineligibility for unemployment benefits, it would be inappropriate for the Commissioner to apply the A or B tests restrictively and mechanically if their applicability is otherwise uncertain.

On this record, we conclude that the Commissioner applied too restrictive an interpretation to the phrase "free from control or direction over the performance of such service." *N.J.S.A.* 43:21–19(i)(6)(A). Because the doctrine of control is derived from the common law and is therefore "not inextricably related to the [Commissioner's] expertise," we need not defer to the Commissioner's interpretation. *Steinmann v. Department of Treasury*, 116 *N.J.* 564, 576, 562 *A.*2d 791 (1989). Various factors should be considered in determining whether a person is "free from control" under the A standard. Although isolated factors in this record may suggest a modicum of control, the Commissioner should have evaluated the entire relationship between CRW and its installers, including in the deliberative process the pragmatic recognition that many of the installers will be ineligible for unemployment benefits by virtue of their diverse sources of income. Specific factors indicative of control include whether the worker is required to work any set hours or jobs, whether the enterprise has the right to control the details and means by which the services are performed, and whether the services must be rendered personally. *See generally Rev.Rul.* 87–41, 1987–1 C.B. 296 (list of twenty factors to be considered in determining existence of control under federal law).

Based on our review of the record, we find insufficient evidence to support the Commissioner's determination that the installers operate under CRW's control and direction. Installers are free to accept or reject any job posted on CRW's

scheduling board and can work as little or as much as they wish. Installers are free to work for any number of CRW's competitors, and did so during the audit period. Installers control the manner and means of installation, guaranteeing only results. *See Restatement of Agency, supra,* § 220 comment c. Moreover, once an installer selects a job, CRW neither controls nor has the right to control the selection of the worker that performs the installation. CRW's only concern is the customer's satisfaction with the quality of installation. Finally, CRW does not provide installers with any fringe benefits and does not withhold any taxes.

The foregoing evidence clearly distinguishes this case from those in which persons were found not to be free from control. Unlike the salespersons in *Schomp v. Fuller Brush Co., supra,* 124 *N.J.L.* 487, 12 *A.*2d 702 and *Electrolux Corp.* I, *supra,* 129 *N.J.L.* 154, 28 *A.*2d 207, the installers are not subject to dismissal for failure to perform a given amount of work or to follow recommended methods of performance. The installers' freedom to work for CRW's competitors also distinguishes them from the persons in the earlier cases. *See Goldberg, supra,* 21 *N.J.* at 113, 121 *A.*2d 12; *Electrolux Corp.* I, *supra,* 129 *N.J.L.* at 156, 28 *A.*2d 207; *Superior Life, supra,* 127 *N.J.L.* at 538–39, 23 *A.*2d 806. Although we ordinarily are reluctant to reverse an administrative agency's evaluation of the record before it, we are satisfied that the Commissioner's determination that the installers are not free from CRW's control is unsupported by sufficient credible evidence in the record.

The Commissioner also concluded that the installers had not satisfied either alternative of the B standard. See *N.J.S.A.* 42:21–19(i)(6)(B). In reaching that finding, the Commissioner relied on the decision in *Irvington Linoleum & Carpet v. Department of Labor, supra,* OAL Docket No. LID 6278–87 (slip op. at 10), in which the ALJ concluded both that "installation service is not outside the usual course of [the

carpet retailer's] business" and that the retailer's places of business "may broadly be said to extend to every geographical point of installation." Under that definition of "places of business," for a person to satisfy the B standard's second alternative would be practically impossible. In our view, that phrase refers only to those locations where the enterprise has a physical plant or conducts an integral part of its business. Hence, we find that the residences of CRW's customers are clearly "outside of all the places of business of [CRW]." *N.J.S.A.* 43:21–19(i)(6)(B). Because the B standard is in the disjunctive, we need not determine whether carpet installation is outside CRW's "usual course of business."

The Commissioner stated that the C standard "requires a clear showing that a viable, independent business exists which would withstand the termination of the relationship in question." The Commissioner held that although Forcellini and Johnston had satisfied the C criterion, the record contained insufficient evidence regarding the remaining installers to satisfy · the C standard. Forcellini and Johnston were the only installers who testified at the hearing before the ALJ. The only specific information contained in the record regarding the other installers is the amounts of remuneration they received from CRW during the audit period. Although the record contains testimony that carpet installers generally provide services for several retailers and are not financially dependent on one retailer, that evidence is not sufficient to satisfy the C criterion. Hence, we remand to the Department, affording CRW an opportunity to satisfy the C standard with respect to the carpet installers other than Forcellini and Johnston.

On remand, the Department must determine whether those installers could have "continue[d] to exist independently of and apart from" their relationship with CRW. *Gilchrist, supra,* 48 *N.J.Super.* at 158, 137 *A.*2d 29. That determination should take into account various factors relating to the installers' ability to maintain an independent business or trade, including

the duration and strength of the installers' businesses, the number of customers and their respective volume of business, the number of employees, and the extent of the installers' tools, equipment, vehicles, and similar resources. The Department should also consider the amount of remuneration each installer received from CRW compared to that received from other retailers. Those who received a small proportion of compensation from CRW are more likely to be able to withstand losing CRW's business.

Because we hold that the Commissioner's findings regarding parts A and B of the ABC test are unsupported by the record, we do not address CRW's argument that the Commissioner engaged in impermissible rulemaking. We reverse the judgment of the Appellate Division that the carpet installers are subject to CRW's control, and we reverse the Commissioner's finding that the carpet installers do not satisfy the B standard. Because the Commissioner found that Forcellini and Johnston satisfied the C standard, CRW has established under the ABC test that those two are not employees. We remand the matter to the Department for further proceedings in accordance with this opinion.

Reversed and remanded.

O'HERN, J. has filed a separate dissenting opinion.

O'HERN, J., dissenting.

Only lawyers and judges could complicate something as simple as an "ABC test." Did you ever go into a carpet store to buy carpet and to have it installed and get the impression that the store guaranteed only the carpet, not a proper installation? And that if the carpet were installed improperly or did not reach the walls or the seams did not match, that the carpet store had no further obligations because the installer was "free from control or direction" over his or her performance and was engaged in an "independently established trade * * * or business?" No one would think that.

To me, the obvious corollary of the majority's holding is that someone here has engaged in a deceptive trade practice under New Jersey's consumer-fraud laws. Under our state consumer-fraud law a "home improvement" is defined as including the installation of "wall-to-wall carpeting or attached or inlaid floor coverings, and other changes, repairs, or improvements made in or on, attached to or forming a part of the residential or noncommercial property," excluding the construction of a new residence. *N.J.A.C.* 13:45A–16.1. If the carpet installers' business is genuinely independent, it would seem to me that unless there had been some exemption granted, there would have to be a written contract that identifies the organization that "will assume some obligation in fulfilling the terms of the contract." *N.J.A.C.* 13:45A–16.2(a)(4)(ii). At least the carpet company should disclose to the buyer that "a person other than the seller is to * * * assume responsibility for performance of the contract." *N.J.A.C.* 13:45A–16.2(a)(13)(i).

The Oregon courts seem particularly responsive to the entreaties of this industry. *See Pam's Carpet Serv., Inc. v. Employment Div.*, 46 *Or.App.* 675, 613 *P.*2d 52 (remanding unemployment-division assessment to consider additional evidence on "quantity and quality of investment" by installers), *review denied*, 289 *Or.* 677 (1980), *appeal after remand*, 61 *Or.App.* 96, 656 *P.*2d 340 (1982) (remanding again for failure to evaluate evidence of "economic dependence" of installers); *see also Carpet Mill & Lighthouse v. Employment Div.*, 56 *Or. App.* 552, 642 *P.*2d 354 (1982) (remanding appeal of carpet-business owner for reconsideration of issue of economic dependency of installers).

It seems unlikely that this Court's involvement in analysis of the business of carpet installation would evoke serious concerns for me. But this case illustrates a recurring concern that I have about the way in which courts relate to administrative agencies. On a previous occasion, I described the "judicialization of administrative law" by which courts determine the procedures that must be followed by agencies in administering

governmental policy. *Woodland Private Study Group v. Department of Envtl. Protection,* 109 *N.J.* 62, 76–83, 533 *A.*2d 387 (1987) (O'Hern, J., dissenting).

This case raises a deeper concern for me, namely, the extent of judicial control over choices of governmental policy made by agencies in the fulfillment of their statutory missions. We have always granted the broadest deference to the agencies of government in determining how best to implement or fulfill governmental policy. *Van Dalen v. Washington Tp.,* 120 *N.J.* 234, 245, 576 *A.*2d 819 (1990). We have but a limited role to play in exercising judicial review over the actions of other governmental agencies. We have often restated those principles. Although sometimes phrased in terms of a search for arbitrary or unreasonable agency action, the judicial role is restricted to three inquiries: (1) whether the agency's action violates the enabling act's express or implied legislative policy; (2) whether there is substantial evidence in the record to support the findings on which the agency based its action; and (3) whether in applying the legislative policy to the facts the agency clearly erred by reaching a conclusion that could not reasonably have been made on a showing of relevant factors. *Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963).

I must assume that in this case the majority considers the action of the agency to fail under either the first or the third inquiry of that traditional test, namely, that it is beyond the statutory authority of the agency to subject carpet installers to the unemployment tax or that the decision to subject these workers to the tax falls so far from the mark that it should be considered arbitrary or unreasonable. There may be some cases in which the installers might be genuinely independent. *See Mississippi State Tax Comm'n v. Bates,* 567 *So.*2d 190 (Miss.1990) (because Mississippi carpet customers either picked up carpet or had installers pick up carpet at Alabama store, and Alabama store made no payments to installers, Alabama carpet store held not to have done business in Mississippi). But the installers are not always viewed as totally independent contrac-

tors, as when they may look to the carpet companies for health and other fringe benefits. *See United Self Insured Servs. v. Faber,* 561 *So.*2d 1358 (Fla.Dist.Ct.App.1990) (estoppel principles required that workers' compensation coverage be extended to installers because carpet seller had withheld money from paychecks and paid premiums for coverage); *Chicago Dist. Council of Carpenters Pension Fund v. Yonan,* 553 *F.Supp.* 653 (N.D.Ill.1982) (collective-bargaining agreement required carpet company to make fringe-benefit contributions on behalf of subcontractors such as carpet installers).

I have no sense here that we are compelled "blindly [to] sustain a clearly erroneous result" with a "sense of wrongness" arising from an "obvious overlooking of crucial evidence." *Trauma Nurses, Inc. v. Board of Review,* 242 *N.J.Super.* 135, 142, 576 *A.*2d 285 (App.Div.1990) (reversing decision that nurses are employees of employment broker). There is simply no comparison between the status of these carpet installers and skilled nurses. In that case, as licensed professionals the nurses were entirely free from control or direction by the employment source: "[T]he hospital is in complete control over his or her activities, subject of course to applicable professional standards." *Id.* at 140, 576 *A.*2d 285.

This then is a payroll-tax case. As the majority correctly points out, *ante* at 580, 593 *A.*2d at 1184, unemployment-compensation funds were created to avoid the catastrophic dislocations occasioned by free-market economics. The purpose of the funds is "to protect the welfare of the people by providing a cushion against the shocks and rigors of unemployment and employment disability." *Trauma Nurses, supra,* 242 *N.J.Super.* at 141, 576 *A.*2d 285. In essence the Department of Labor has decided, under the mandate given to it, not to exempt this form of economic enterprise from the broad-based tax that sustains that fund. When it comes to governmental taxation decisions, we have always exhibited the highest degree of deference to the taxing authority. In the field of taxation, states are given "large leeway in making classifications and

drawing lines which in their judgment produce reasonable systems of taxation." *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 *U.S.* 356, 359, 93 *S.Ct.* 1001, 1003–04, 35 *L.Ed.*2d 351, 355 (1973).

The majority's reasoning for invalidating the levy of this tax on the carpet installers is flawed. The Court's theory is that because no benefits may flow to the party who is subject to the levy, the levy itself is invalid. If that were so, those of us who hold tenured positions of office should be exempted from the tax because there is no chance that we will realistically ever achieve its benefits. The perfectly congruent symmetry sought by the majority assumes a perfection of analysis that is required neither by constitutional principle nor by the structure of the statute. That some members of the burdened class do not benefit from the system does not render the classification arbitrary. "If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations * * *." *Dandridge v. Williams,* 397 *U.S.* 471, 485, 90 *S.Ct.* 1153, 1161, 25 *L.Ed.*2d 491, 501–02 (1970) (citations omitted). In essence, the Court, by insisting on that symmetry, is making a policy determination that persons who are not likely to be in need of unemployment benefits should not be compelled to pay into the fund, nor should their employers.

In exercising that policy function the Court fulfills the prophesy of Justice Neely of the West Virginia Supreme Court that "[t]he judiciary can be trusted to oversee bureaucrats because it does not share the same institutional bias." Collard, Book Review, 57 *Notre Dame L.Rev.* 616 (1982) (reviewing R. Neely, *How Courts Govern America* (1981)).

The debate about the degree of deference that courts should accord to administrative agencies has been a forty-year struggle and the end is nowhere in sight. Justice Frankfurter

pointed out long ago that "[s]ince the precise way in which courts interfere with agency findings cannot be imprisoned within any form of words, new formulas attempting to rephrase the old are not likely to be more helpful than the old." *Universal Camera Corp. v. NLRB*, 340 *U.S.* 474, 489, 71 *S.Ct.* 456, 465, 95 *L.Ed.* 456, 468 (1951). In New Jersey, we have tended to restate the familiar three-part test: whether there was sufficient evidence in the record, whether the agency decision was within its statutory authority, and whether there was a clear abuse of discretion. *Supra* at 572–573, 593 *A.*2d at 1180. Recently, however, there has been a good deal of rethinking about administrative law. In a book entitled *Administrative Law: Rethinking Judicial Control of Bureaucracy*, Professor Edley suggests new formulas. "Where else might we look?" he asks. He concludes: "The generative element of legitimacy is that courts must be perceived to be contributing to sound government. This is a concrete source of public acceptance. The other two branches rely on it for legitimacy. So it should suffice for the judiciary as well."

The real question though is whether courts are better perceived as contributing to sound government when we defer to administrative agencies or when we revise their decisions. We hear much of an overburdened judiciary and yet we continue to make what one must recognize as essentially bureaucratic decisions: whether a school employee should be retained in employment, *Hall v. Board of Educ.*, 125 *N.J.* 299, 593 *A.*2d 304 (1991); whether an employee should be denied unemployment-compensation benefits based on the circumstances of her case, *Self v. Board of Review*, 91 *N.J.* 453, 453 *A.*2d 170 (1982); and finally, as here, whether this carpet company should contribute to maintain the State's unemployment-compensation fund. To me, that is a simple question of governmental policy. It should wisely be left to the judgment of the agency entrusted by the Legislature with the administration of the program. It is just possible that society could resolve the problem of the carpet installers without our judicial involvement. After all, as

the majority points out, a vast array of similarly situated businesses and industries have gained the attention of the Legislature, and their situations have been resolved. *Ante* at 580, 593 *A*.2d at 1184. I think that we reinforce that democratic process when we let it be understood that these are primarily matters of governmental policy best resolved by those who have access to the economic information.

*For Reversal and Remandment*—Chief Justice WILENTZ, Justices CLIFFORD, HANDLER, POLLACK, GARIBALDI and STEIN—6.

*Dissenting*—Justice O'Hern—1.