242 N.J. Super. 135 (1990)
576 A.2d 285
TRAUMA NURSES, INC., PETITIONER-APPELLANT,
v.
BOARD OF REVIEW, NEW JERSEY DEPARTMENT OF LABOR, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 28, 1990.
Decided April 20, 1990.
*137 Before Judges BAIME and KEEFE.
Steven W. Suflas argued the cause for appellant (Archer & Greiner, attorneys; Steven W. Suflas and Nancy E. Milsten on the brief).
Bessie A. Sacco, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel; Bessie A. Sacco on the brief).
BAIME, J.A.D.
This is an appeal from the final determination of the Board of Review, reversing the decision of the Appeal Tribunal and holding that claimant Carolyn Douglas was an employee of appellant Trauma Nurses, Inc. (TNI) and was thus statutorily eligible for State Plan Disability benefits. Appellant claims that Douglas was an independent contractor and that the Board's decision to the contrary is wholly unsupported by the undisputed evidence present in the record. We agree and reverse.
The salient facts are not in dispute. TNI is in the business of supplying hospitals with nurses on a temporary basis. In essence, TNI acts as an employment broker, matching nursing professionals with hospitals and other health care institutions seeking to supplement their staffs on a temporary, short-term basis. Due to the ongoing acute shortage of nurses in New Jersey, many hospitals utilize registries and broker services to supplement permanently employed personnel. At present, approximately 180 nurses are under contract with TNI. TNI *138 primarily brokers the services of registered nurses, although it occasionally acts for licensed practical nurses such as Douglas.
The record reflects that TNI recruits its nurses through advertisements in professional journals and newspapers. Prior to entering contracts with TNI, nurses are screened to insure that they are appropriately qualified. Each nurse must provide TNI with a resume, clinical references, proof of malpractice insurance, health and disability insurance coverage, a valid CPR certification and a nursing license. All requisite insurance policies must be obtained and paid for by the nurses. In addition, the applicant must complete both a skills checklist, as required by the Joint Commission for Accreditation of Hospitals, and a physical assessment test, demonstrating the nurse's qualifications to meet hospital staffing requirements. The skills checklist is later used by TNI to match the nurse's qualifications with the personnel needs of particular hospitals.
At the completion of the application process, each nurse enters into a written agreement with TNI. Under the terms of the agreement, the nurse is engaged as an "independent professional" and TNI is given no right "to exercise any control or direction" over his or her activities. The contract states that the nurse is subject to whatever policies and practices are mandated by the hospital or institution in which he or she is placed and TNI retains no right to dictate the manner in which he or she conducts his or her activities, subject to professional standards which are to be maintained by continuing education throughout the term of the agreement. TNI provides a liaison to the hospital, but it has no supervisory responsibility over the nurse. Instead, it assists the hospital in setting staffing levels, obtains additional nursing support to meet emergent needs and mediates disputes where the hospital cannot resolve the problem directly with the nurse.
The contract is for a period of one year, with optional yearly renewals. It may be terminated, however, if for some reason, the nurse fails to maintain appropriate insurance and professional *139 certification and licenses. The record discloses that TNI has rarely terminated a contract, although nurses often elect to stop utilizing its services.
Each nurse negotiates with TNI to set an individual hourly rate, which varies depending upon his or her experience and qualifications. Nurses notify TNI on a weekly basis of the number of shifts completed. Each is paid according to the rates set forth in his or her contract, within 14 days of submission of this information. This procedure is designed to eliminate extra bookkeeping for hospitals, because they send one check to TNI representing compensation for all nurses who worked during a given time period. After subtracting its administrative and placement charges from the lump sum paid by the hospitals, TNI acts as a conduit to forward monies owed to the nurses by the hospitals. Although the Attorney General claims that TNI retains 40 to 50% of the amounts received, the record does not support this contention, which is apparently based on different yearly rates and payments and is thus not accurate.
Perhaps the most telling point in light of the issues raised relates to TNI's scheduling procedures. We stress that under the agreement the nurse alone decides whether to work, when to work, what shifts he or she wishes to work and his or her working hours. TNI retains no right to decide whether a nurse will work at all and, if he or she does, when, what shifts and what working hours. Nurses inform TNI of the hospitals and shifts that they are willing to work. TNI does not set a minimum or maximum number of shifts to be worked in a given period. That is left to the sole discretion of the nurses. TNI merely mails blank scheduling forms to the nurses each month to be completed for the following month and returned. After matching the nurses' proposed schedules with the personnel needs of the hospitals, TNI mails out a copy of the month's final schedule for each nurse and confirms each shift on the calendar. Once the schedule is confirmed, nurses are required to work each scheduled shift or to make arrangements on their *140 own with other qualified nurse contractors for coverage of any shifts that they are unable to work, subject to TNI's approval. Should a nurse fail to complete a shift or obtain a suitable substitute, he or she is charged a penalty.
TNI placement is not necessarily the exclusive source of a nurse's work. No restriction is placed on a nurse's right to obtain placement by another broker or to obtain work independently. Frequently, nurses utilize other brokers along with TNI. For example, Douglas contracted with two other temporary nursing service agencies and worked at other hospitals through these non-TNI referrals. Douglas' schedule through TNI ranged from as little as one eight-hour shift per week to as much as five or more shifts per week.
TNI solicits business from hospitals in need of temporary nursing personnel. Hospitals contract with TNI on a non-exclusive basis. Most hospitals have ongoing relationships with several brokers in order to expand the available pool of nurses. These brokers represent a significant source of nursing personnel, because most hospitals employ a sufficient number of nurses to satisfy projected nursing needs based upon a 70% occupancy rate. If the occupancy rate increases, or staffing levels decrease due to attrition or absenteeism, brokers are contacted to provide additional nurses.
It is abundantly plain from the record that once a nurse is placed, the hospital is in complete control over his or her activities, subject of course to applicable professional standards. Nurses are subject to the policies, practices and procedures of the particular hospitals in which they are placed. The hospital retains the right to dismiss a nurse if his or her skill level is deficient or his or her professional standards do not meet the institution's requirements. The hospital provides the nurses with all necessary equipment and supplies. The actual treatment of the patient is coordinated by the physician and hospital personnel. Although TNI screens and selects qualified nursing personnel, TNI, both by its contractual undertaking *141 and its actual conduct, exercises no control whatsoever over the conduct of the nurse's professional activities.
Based upon the foregoing evidence, the Appeal Tribunal determined that Douglas was an independent contractor and was not an employee of TNI. Specifically, the Appeal Tribunal found that TNI exercised no control or direction over the performance of the nurse's duties, the nurse's services were outside the usual course of TNI's business and the activities of a nurse constituted an independently established business.
The Board of Review reversed and withdrew the Appeal Tribunal's decision. See N.J.A.C. 12:20-3.4(d). While adopting the Appeal Tribunal's findings of fact, the Board concluded that the claimant "remained under the direction and control of the employer" because Douglas was "required ... to perform certain services in order to remain employed" and because TNI received "continuing payments from clients" and paid nurse contractors "on a week by week basis."
We are convinced that the Board's decision was not supported by the evidence presented and deviated from applicable statutory requisites. At the outset, we recognize the narrow scope of our review powers and the presumptive correctness of the administrative agency's determination. See Clowes v. Terminex Intern., Inc., 109 N.J. 575, 585, 538 A.2d 794 (1988); Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 28, 429 A.2d 341 (1981); Henry v. Rahway State Prison, 81 N.J. 571, 579-580, 410 A.2d 686 (1980); New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 562-563, 384 A.2d 795 (1978). We also acknowledge the remedial object of the Unemployment Compensation Act (N.J.S.A. 43:21-1 to -56), to protect the welfare of the people by providing a cushion against the shocks and rigors of unemployment and employment disability. See Provident Inst. for Sav. in Jersey City v. Div. of Employ. Sec., 32 N.J. 585, 590, 161 A.2d 497 (1960); Bogue Electric Co. v. Board of Review, 21 N.J. 431, 435, 122 A.2d 615 (1956); Gilchrist v. Div. of Employment Security, 48 *142 N.J. Super. 147, 153, 137 A.2d 29 (App.Div. 1957). Clearly, the statutory scheme should be liberally construed to accomplish that end with the result that the relation of employer and employee may be deemed to exist under circumstances which would not lead to that determination under the common law classification. Gilchrist v. Div. of Employment Security, 48 N.J. Super. at 153, 137 A.2d 29. In applying the provisions of the Act, we are obliged to look behind the contractual language to the actual situation  the status in which the parties are placed by the relationship that exists between them. Id. at 154, 137 A.2d 29; see also Provident Inst. for Sav. in Jersey City v. Div. of Employ. Sec., 32 N.J. at 590, 161 A.2d 497.
This much conceded, the policies that require us to view with deference the decisions of administrative agencies and to liberally construe remedial social legislation do not compel us to blindly sustain a clearly erroneous result. In that respect, we are entirely satisfied that the conclusion reached by the Board is plainly a mistaken one and is so clearly unwarranted that the interests of justice demand intervention and correction. We harbor a definite conviction that the Board went so wide of the mark that a mistake must have been made. Our sense of wrongness arises from what we perceive to be the Board's obvious overlooking of crucial evidence.
We begin our analysis with the operative statutory language which defines "employment" as "services ... performed for remuneration or under any contract for hire, written or oral, express or implied." N.J.S.A. 43:21-19(i)(1)(A). Under N.J.S.A. 43:21-19(p), "remuneration" is defined as "all ... compensation and bonuses and the cash value of all compensation in any medium other than cash." The Act thus provides that all services performed by an individual for remuneration constitute employment unless the individual satisfies the three requirements set forth in N.J.S.A. 43:21-19(i)(6)(A), (B) and (C). See Schomp v. Fuller Brush Co., 124 N.J.L. 487, 490, 12 A.2d 702 (Sup.Ct. 1940), aff'd 126 N.J.L. 368, 19 A.2d 780 (E. & *143 A. 1941). These requirements, commonly known as the A, B, C test, are as follows:
Services performed by an individual for remuneration shall be deemed to be employment subject to this chapter (N.J.S.A. 43:21-1 et seq.) unless and until it is shown to the satisfaction of the Division that:
(A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and
(B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business. [N.J.S.A. 43:21-19(i)(6)(A), (B) and (C)].
This statutory provision is to be read in the conjunctive, and, therefore, an entity whose "employee" fails any one criterion of the three-pronged test is considered an employer under the Act. See William H. Goldberg & Co. v. Div. of Employ. Sec., 21 N.J. 107, 113, 121 A.2d 12 (1956); Bloom v. Div. of Employ. Sec., 69 N.J. Super. 175, 179, 174 A.2d 16 (App.Div. 1961).
We first consider the question of the extent to which Douglas and the other nurse contractors were subject to TNI's control. As we noted previously, the Board disagreed with the Appeal Tribunal's conclusion that the nurses placed in different hospitals and health care institutions were not subject to TNI's direction. The Board's determination was predicated upon the fact that (1) nurses were "required ... to perform certain services in order to remain employed," and (2) TNI received "continuing payments from [hospitals]" and paid nurses on a "week by week basis."
These circumstances are not supportive of the Board's ultimate conclusion that Douglas was an employee of TNI. The fact that Douglas was required to perform services is common to both an employment and independent contractor status. In order to receive payment, an independent contractor is obliged to perform services. If we were to accept the conclusion that the performance of services creates an employment relationship, the "A" prong of the statutory tripartite test could never *144 be satisfied, and the status of independent contractor would cease to exist under the statute. Simply stated, the performance of services does not differentiate an employment relationship from an independent contractor relationship. A contrary interpretation of subsection A would essentially render nugatory the statutory scheme.
We also note that under the written agreement Douglas was obliged to perform services not to fulfill any contractual obligation owed to TNI, but rather in order to obtain payment from a hospital. As we emphasized in our recital of the facts, nurses were free to decline any work offered by TNI. Nurses could refuse to accept any particular shift and could decline to work at all without impairing their contractual relationship with TNI. The contractual relationship between the nurses and TNI would continue to exist even though no services were performed by the nurses.
We find generally unpersuasive the circumstance that nurses were paid by TNI on a weekly basis. In reality, TNI served as a conduit for payment of the nurses by the hospital. Under its arrangement with client hospitals, a single check could be sent to TNI, representing payment for the services of all nurses placed by TNI. While we agree that continuing payments represent some evidence of an employment relationship, it cannot fairly be said that these circumstances disclose TNI's right to control or direct the activities of the nurses.
Instead, we find the following circumstances to be determinative. First, nurses chose on a monthly basis the hospitals and shifts they wished to work. They could work as little or as much as they wished. Second, nurses were free to work elsewhere. They could utilize the services of other brokers or seek work independently. They could decline work offered by TNI and choose to work elsewhere. Third, the nurses were not obliged to comply with any rules, practices or procedures set by TNI in performing their professional duties. Instead, they were required to comply with the rules of the particular institution *145 in which they were placed. Fourth, TNI did not issue any instructions or require nurses to report to its offices. Fifth, TNI exercised no supervisory responsibility over the nurses. Nurses were supervised by their supervisors at the particular hospitals where they were placed. Sixth, TNI offered no training to nurses. Instead, nurses were obliged to continue their education on their own and at their own expense. Seventh, TNI did not furnish any supplies, equipment or uniforms to its nurses. Finally, TNI did not provide nurses with any fringe benefits, such as sick pay, vacations, pensions or bonuses. In addition, nurses were responsible for their own medical, disability and malpractice insurance coverage.
The facts here are plainly distinguishable from those present in the decisions upon which the Attorney General relies. In Electrolux Corp. v. Board of Review, 129 N.J.L. 154, 28 A.2d 207 (E. & A. 1942), for example, the claimant was required to sell only the employer's products, all orders were required to be taken on printed contract forms supplied by the employer, the contracts with customers were entirely standardized and no deviation or variation was permitted, sales prices were established by the employer and no negotiations, rebates, allowances or concessions were permitted, trade-in values were fixed by the employer, employees were furnished with sample machines the title to which remained in the employer, there was a highly structured sales organization and hierarchial supervision. Id. at 156-157, 28 A.2d 207. Similarly, in Schomp v. Fuller Brush Co., the employee was given a particular sales territory, he could not work elsewhere, branch managers provided standardized instructions in the method of salesmanship desired by the employer, the employer periodically gave personal instructions in the field, and employees were subject to dismissal if they did not meet specific sales quotas. Id. at 490-491, 12 A.2d 702. Likewise, in Steel Pier Amusement Co. v. Unemployment Compensation Comm., 127 N.J.L. 154, 21 A.2d 767 (Sup.Ct. 1941), employee musicians were given rigid performance schedules, they were told what music they should play and what *146 accompaniments they were required to give and they took orders and were under the control of the employer. Id. at 157, 21 A.2d 767. In Provident Inst. for Sav. in Jersey City v. Div. of Employ. Sec., members of the bank's executive committee were paid for services consisting of establishing policies, they exercised supervisory responsibilities over employees, and they acted generally as higher level employees within the common corporate structure. 32 N.J. at 592, 161 A.2d 497. Finally, in Superior Life and Health and Accident Ins. Co. v. Board of Review of Unemployment Compensation Commission, 127 N.J.L. 537, 23 A.2d 806 (Sup.Ct. 1942), employees were given specific territories for the sale of insurance, they were responsible for collections and paid a percentage of the amount collected, they were prohibited from engaging in competitive work, they were informed of the addresses of named policyholders and were directed when and how much to collect, they were given standardized advertising materials and were instructed with respect to the method of salesmanship, and they could not deviate from such instructions. Id. at 538-540, 23 A.2d 806. Our review of the record convinces us that none of these critical facts and circumstances is present in this case.
We are thus satisfied that the Board erred in its conclusion that TNI controlled and directed the performance of the services of nurse contractors. The evidence abounds the other way. In reaching this conclusion, we recognize that nurses are professionals and that the details of their work are ordinarily not subject to close supervision. See Marcus v. Eastern Agricultural Ass'n., Inc., 58 N.J. Super. 584, 597, 157 A.2d 3 (App.Div. 1959) (Conford, J., dissenting), rev'd on dissenting opinion 32 N.J. 460, 161 A.2d 247 (1960). We acknowledge that where the type of work requires little supervision over details for its proper prosecution and the person performing it is so experienced that instructions concerning such details would be superfluous, a degree of supervision no greater than that which is held to be normally consistent with an independent contractor status might be equally consistent with an employment relationship. *147 Ibid. Even within that context, however, we discern no control or direction over the activities of nurses by TNI. Whatever control, direction and supervision there was with respect to the nurses was exercised by the hospitals in which they were placed, not TNI. We are therefore convinced that TNI satisfied the "control" criterion set forth in N.J.S.A. 43:21-19(i)(6)(A), and that the Board's finding to the contrary is clearly erroneous.
As we observed earlier, the Board in its decision did not expressly disturb the conclusion of the Appeal Tribunal that the "B" and "C" tests were satisfied on the undisputed record in this case. The Board made no findings and reached no conclusions with respect to (1) whether the services performed by the nurses were "outside the usual course" of TNI's business, see N.J.S.A. 43:21-19(i)(6)(B), and (2) whether the nurses were "customarily engaged in an independently established ... profession," see N.J.S.A. 43:21-19(i)(6)(C). Although a cogent argument can be made that the Board tacitly conceded the "B" and "C" prongs were met on this record, we will address those questions for the sake of completeness.
With respect to the subsection B criterion, the Attorney General argues that TNI is in the business of providing health care, rather than brokering nursing personnel to hospitals. We reject this strained contention. The record does not substantiate the naked claim that a broker in the business of matching a nurse with the personnel needs of a hospital is undertaking the provision of health care services. The service of supplying health care personnel does not translate into the business of caring for patients. Cf. In re Renouf, 254 N.Y. 349, 351, 173 N.E. 218, 220 (1930); see also Saiki v. United States, 306 F.2d 642 (8th Cir.1962). The simple and overriding fact is that TNI does not perform patient care. It brokers nurses. Douglas, as well as other nurses placed by TNI, performed nursing services, a function clearly beyond the purview and usual course of TNI's business. Further, it is undisputed that nurses do not *148 work in the TNI office. They report directly to hospitals. We, therefore, conclude that the B criterion was fully satisfied.
Finally, we are convinced that nurses are engaged in an independently established profession, as required by N.J.S.A. 43:21-19(i)(6)(C). See David v. Employers' Mutual Ins. Co., 124 N.J. Super. 377, 380, 307 A.2d 123 (App.Div. 1970), certif. den. 63 N.J. 580, 311 A.2d 3 (1973); Chmizlak v. Levine, 20 N.J. Misc. 339, 340-341, 27 A.2d 629 (Dept. of Labor 1942). Clearly, the independent nature of their profession would survive without the existence of TNI. See Bloom v. Div. of Employment Sec., 69 N.J. Super. at 179-180, 174 A.2d 16. Nurses must fulfill educational and licensure requirements in order to practice their profession. As pointed out in TNI's brief, they are able to obtain positions either as full-time employees, part-time employees, independent contractors, shift workers, etc. In the context of this case, the individual nurses do not work exclusively through TNI. Instead, most work simultaneously for other brokers, hospitals and health care institutions.
In sum, the undisputed evidence clearly established the statutory requisites of N.J.S.A. 43:21-19(i)(6)(A), (B) and (C). The determination of the Board is accordingly reversed.