**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4508-17T3

MKI ASSOCIATES, LLC,

      Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE
DEVELOPMENT,

      Respondent-Respondent.

_____

          Argued September 25, 2019 – Decided October 10, 2019

          Before Judges Koblitz, Gooden Brown, and Mawla.

          On appeal from the New Jersey Department of Labor and Workforce Development, Docket No. 16-001.

          Evan L. Goldman argued the cause for appellant (Law Offices of Goldman Davis, PC, attorneys; Evan L. Goldman and Kristen Ragon, on the briefs).

          Emily Marie Bisnauth, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Daniel Pierre, Deputy Attorney General, on the brief).

PER CURIAM

Appellant MKI Associates, LLC appeals from an April 25, 2018 final agency decision of respondent Board of Review, New Jersey Department of Labor and Workforce Development (Department), reversing the decision of an Administrative Law Judge (ALJ), finding therapists that MKI placed in work assignments with healthcare facilities were independent contractors. The Board determined the therapists were employees, and that MKI failed to meet its burden under N.J.S.A. 43:21-19(i)(6)(A)-(C) to prove otherwise. We affirm.

In 2015, the Department determined MKI owed $118,347.75 in unpaid contributions to the unemployment compensation fund and the State disability benefits fund, under the New Jersey Unemployment and Temporary Disability Laws (UCL), for the audit period between 2011 and 2014. MKI disputed the Department's findings and a hearing occurred before an ALJ.

We summarize the salient facts adduced at the hearing. MKI is owned and operated by Monica and Kevin Iula.[1] The company recruits, screens, and interviews therapists to work at healthcare facilities, and assigns therapists on a

_____

[1]  We utilize the Iulas's first names to differentiate them because they share a common surname. We intend no disrespect.

temporary basis to various facilities in northern New Jersey when there are openings.

MKI requires its therapists to sign a "Consulting Agreement" which states MKI agrees to engage the therapists to provide the facilities with rehabilitation services. MKI's therapist contract lasts for an indefinite term and can only terminate with a two-week written notice. The contract outlines the therapists' compensation and contains a non-compete clause stating:

> Other than with the express written consent of the [c]ustomers, which will not be unreasonably withheld, the [therapist] will not, during the continuance of this Agreement or within [one] year after the termination of this Agreement, be directly or indirectly involved with a business which is in direct competition with the particular business line of the [c]ustomers, divert or attempt to divert from the [c]ustomers any business the [c]ustomers ha[ve] enjoyed, solicited, or attempted to solicit, from other individuals or corporations, prior to termination of this Agreement.

The contract contains a non-solicitation clause, which prevents the therapists from interfering with MKI's relationships with its other employees, consultants, and customers.

MKI also enters into a "Staffing Contract" with the facilities, which retain the services of its therapists. The staffing contract provides MKI must pay the therapists the wages it offers them. It also requires the therapists to keep their

files and submit any "requisite monthly family notice and verification logs." It further provides the facilities cannot change the therapists' job responsibilities without first obtaining MKI's written approval. Similar to the consulting agreement, the staffing contract contains a non-compete and non-solicitation clause. The clause states the client

> specifically agrees that an independent contractor therapist cannot be hired by [the client] without a buyout agreement between [the client] and [MKI] or after a [one] year period has passed from the last day that the independent contractor was assigned under the direction of [the client]. [The client] agrees that a buyout agreement must be procured and finalized prior to any negotiations or engagements in any way, directly or indirectly, that induce or attempt to induce the independent contractor therapist to become an employer or enter into a direct business agreement with [the client] or violate the terms of his/her contract with [MKI].

The clause also states if the client facility uses the services of a therapist placed by MKI "as its direct employee in any capacity within 365 days starting from the period after the end of any assignment of the [therapist] to [the client] from [MKI], [the client] must notify [MKI] and pay [MKI] a fee . . . of $5000."

Kevin testified the therapists are paid twice per month by MKI and never by the facilities. MKI requires the therapists to submit biweekly timesheets to MKI to receive their paychecks. MKI guarantees the therapists' wages, even

when it does not receive payment from the facilities for the services rendered. Monica testified MKI often waited six months to a year to receive payment from the facilities. Kevin and Monica paid the therapists' wages directly from their personal bank accounts. MKI negotiates the rates of pay for the therapists' services.

MKI offered testimony of three therapists who stated they were paid exclusively by MKI, prohibited from negotiating their rate of pay directly with the facilities, and required to submit timesheets to MKI to be paid. Notwithstanding, the therapists testified they believed their relationship with MKI was that of an independent contractor and MKI did not control the manner of their work or their work schedule, provide training for the therapists, or prevent them from seeking work elsewhere. Notably, the therapists testified one-hundred percent of their business revenue was generated from income they received from MKI and their individual businesses had no employees. None of the therapists used their own business telephone, stationary, or advertisements.

The auditor who performed the audit of MKI, testified on behalf of the Department. She stated the audit was conducted as a result of a claim for disability benefits filed by a former MKI therapist. She concluded the therapists placed by MKI were employees, not independent contractors. She noted MKI

5

paid the therapists' wages, required the therapists to submit timesheets, established and controlled the wages the therapists received, and were subject to non-compete and non-solicitation contractual obligations. She concluded MKI hired therapists to perform services in the usual course of MKI's business, which she determined was the provision of healthcare. She found the therapists hired provided therapeutic services at healthcare facilities, rendering such facilities quasi-offices of MKI. She determined most of the therapists hired by MKI did not have an independently established business, because the therapists relied predominantly on the income they received from MKI.

The ALJ found MKI satisfied all three prongs of N.J.S.A. 43:21-19(i)(6)(A)-(C) and reversed the Department's determination. The Department submitted exceptions to the Commissioner who issued a final agency decision reversing the ALJ.

The Commissioner concluded prong A was not satisfied because

> the documents governing the relationships between MKI and the therapists and between MKI and its clients, as well as the testimony of witnesses confirming the practices of MKI, reflect a degree of control over the therapist that is consistent with an employment relationship and belies [any] assertion . . . that these individuals were free from control or direction by MKI.

The Commissioner found "the 'staffing contract' between MKI and its clients contains a '[r]ate [s]chedule' listing the hourly rates to be charged for the services" of its therapists, and the rates the healthcare facilities paid MKI and that MKI paid its therapists were both set by MKI. He noted the therapists were not free to negotiate their own hourly rate with MKI's clients, and according to MKI's contracts,

> the client is prohibited from changing the "Assigned Contractor's" job duties without MKI's "express prior written approval" and contains a "non-compet[e] and non-solicitation" clause, . . . that prohibits the client from employing any MKI therapist without first entering into a "buyout agreement" with MKI or after [one] year has passed from the last date on which the therapist performed services for the client on assignment from MKI.

The Commissioner concluded the terms of the contracts clearly showed MKI exerted or reserved the right to exert control over the therapists it placed, prevented the therapists from being involved with a competitor, and the ALJ incorrectly characterized these provisions as immaterial. According to the Commissioner, these clauses were contained in the staffing contracts presented by MKI to its clients and in the independent contractor consulting agreements presented by MKI to its therapists as a condition of engaging their services.

A-4508-17T3

As to prong B, the Commissioner found the therapists' services were neither outside MKI's usual course of business, nor performed outside of MKI's places of business. He concluded MKI's course of business was providing therapeutic services and the facilities where the therapists worked were locations where MKI conducted an integral part of its business, namely, providing therapeutic services pursuant to the staffing contracts MKI maintained with its clients.

The Commissioner also found the Department failed to satisfy prong C. He concluded Trauma Nurses, Inc. v. N.J. Dep't. of Labor, 242 N.J. Super. 135 (App. Div. 1990), upon which the ALJ relied in reversing the Department's decision, was distinguishable. He noted MKI provided replacement staff in the event one of its therapists was unable to work and established the hourly rate and the rate the facility would pay, rather than the therapists themselves negotiating their hourly rates. Unlike Trauma Nurses, the contracts between MKI, its clients, and its therapists contained non-compete and non-solicitation clauses, which governed the manner of the therapists' work while under contract with MKI and up to one year after its termination.

The Commissioner concluded MKI failed to establish each therapist was engaged in a viable, independently-established business at the time he or she

rendered the services to MKI. MKI failed to address the duration and strength of each therapist's business, the number of customers and the volume of business of each therapist, the extent of each therapist's business resources, and the remuneration each therapist received from MKI compared to other sources. By contrast, the Department auditor testified all of the documentary evidence she obtained in the form of Federal Form 1040 Schedule C's showed all of the business income of those individuals derived from services rendered for MKI.

## I.

We "have 'a limited role' in the review of [agency] decisions." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). "[A] 'strong presumption of reasonableness attaches to [an agency decision].'" In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). "In order to reverse an agency's judgment, [we] must find the agency's decision to be 'arbitrary, capricious, or unreasonable, or . . . not supported by substantial credible evidence in the record as a whole.'" Stallworth, 208 N.J. at 194 (quoting Henry, 81 N.J. at 579-80). The burden of proving an agency action is "arbitrary, capricious, or unreasonable" is on the challenger. Bueno v. Bd. of Trs., 422 N.J. Super. 227, 234 (App. Div. 2011) (quoting Henry, 81 N.J. at 579-80).

We "may not substitute [our] own judgment for the agency's, even though [we] might have reached a different result." Stallworth, 208 N.J. at 194 (quoting In re Carter, 191 N.J. 474, 483 (2007)). "It is settled that '[a]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 355 (App. Div. 2010) (alteration in original) (quoting Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J. Super. 52, 56 (App. Div. 2001)).

Under the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15, "[i]n reviewing the decision of an administrative law judge, the agency head may reject or modify findings of fact, conclusions of law or interpretations of agency policy in the decision, but shall state clearly the reasons for doing so." N.J.S.A. 52:14B-10(c).

## II.

Pursuant to N.J.S.A. 43:21-19(i)(6), "[s]ervices performed by an individual for remuneration shall be deemed to be employment" unless the putative employer proves each of three prongs:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact; and

(B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.

[N.J.S.A. 43:21-19(i)(6)(A)-(C).]

If each element is not met, then the claimant is an employee, not an independent contractor. Hargrove v. Sleepy's, LLC, 220 N.J. 289, 305 (2015).

In Hargrove, the Court explained the considerations under each part as follows:

> In order to satisfy part A of the "ABC" test, the employer must show that it neither exercised control over the worker, nor had the ability to exercise control in terms of the completion of the work. In establishing control for purposes of part A of the test, it is not necessary that the employer control every aspect of the worker's trade; rather, some level of control may be sufficient.
>
> Part B of the statute requires the employer to show that the services provided were "either outside the usual course of the business . . . or that such service is performed outside of all the places of business of the enterprise." N.J.S.A. 43:21-19(i)(6)(B). While the common law recognizes part B as a factor to consider, it is not outcome determinative within the confines of the "right to control" test.

11

Part C of the statute is also derived from the common law. This part of the test "calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." Therefore, part C of the "ABC" test is satisfied when an individual has a profession that will plainly persist despite the termination of the challenged relationship. When the relationship ends and the individual joins "the ranks of the unemployed," this element of the test is not satisfied.

[220 N.J. at 305-06 (citations omitted).]

The ABC test's analysis is not limited to the terms of the contract between the parties. Whether an individual is an employee "should not be determined under the [a]greement alone, but rather on all facts surrounding [the individual's] relationship with [the employer], including the [a]greement." Phila. Newspapers, Inc. v. Bd. of Review, 397 N.J. Super. 309, 321 (App. Div. 2007).

On appeal, MKI challenges the Commissioner's findings under all three prongs of the ABC test. Under prong A, MKI argues it did not exercise control over its therapists and the Commissioner ignored the weight of the evidence and the relevant case law. MKI argues prong B was met because it had no offices and operated outside of the Iulas's residence, where no therapy was provided. It argues pursuant to Trauma Nurses, prong C was met because the therapists could

choose the facilities and hours they worked, and had worked at other facilities outside of any contractual obligation to MKI.

## A.

Prong A requires a company to establish not only that it "has not exercised control in fact, but also that the employer has not reserved the right to control the individual's performance." Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Labor, 125 N.J. 567, 582 (1991). Characteristics of control include: "whether the worker is required to work any set hours or jobs, whether the enterprise has the right to control the details and the means by which the services are performed, and whether the services must be rendered personally." Phila. Newspapers, 397 N.J. Super. at 321 (quoting Carpet Remnant Warehouse, 125 N.J. at 590).

MKI's arguments are unpersuasive. Its consultant agreements and staffing contracts contained provisions reserving MKI's right to control the place and manner in which the therapists conducted their business. The means of control were expressly set forth in the non-compete and non-solicitation clauses, the buy-out provision, and clauses restricting the ability of the facility and a therapist to engage in full-time employment without MKI's written approval.

Additionally, the evidence in the record established MKI paid therapists for the services performed at the healthcare facilities. Therapists were not permitted to contact or negotiate their wages directly with the facilities. Instead, the therapists' wages were negotiated with MKI and it separately negotiated the rates the facilities would pay. Therapists submitted timesheets to MKI, which then paid them and guaranteed their wages.

Contrary to MKI's argument on appeal, "it is not necessary that the employer control every aspect of the worker's trade; rather, some level of control may be sufficient." Hargrove, 220 N.J. at 305 (citing Schomp v. Fuller Brush Co., 124 N.J.L. 487, 491 (Sup. Ct. 1940)). For these reasons, the Commissioner's prong A findings did not constitute reversible error.

B.

Prong B requires a showing that the services are outside of either the employer's usual course of business or all of the employer's places of business. Carpet Remnant Warehouse, 125 N.J. at 584. Our Supreme Court stated the prong refers "only to those locations where the enterprise has a physical plant or conducts an integral part of its business." Id. at 592.

Contrary to MKI's argument, the facts here are distinguishable from Trauma Nurses. In Trauma Nurses, we concluded the nature of the business was

not providing health care, but rather "brokering nursing personnel to hospitals." Trauma Nurses, 242 N.J. Super. at 147. Thus, the work of providing nurses to hospitals exceeded the usual course of the business. Id. at 147-48.

Here, the Commissioner found "the principal part of MKI's business enterprise is providing therapeutic services pursuant to the staffing contracts that MKI maintains with its clients, the facilities where those services are performed under the staffing contracts are locations where MKI conducts an 'integral part of its business.'" Indeed, the fees MKI derived from the facilities formed the sole source of its income. Moreover, as the respondent noted at oral argument, in MKI's public bidding documents it represented it would provide workers' compensation benefits to its employees, a benefit not conferred by a staffing agency. Also, MKI is registered as a provider of therapy, not as a placement agency. Therefore, unlike Trauma Nurses, MKI exclusively held itself out as a provider of therapists to facilities as an integral part of its business.

## C.

> Part C of the statute . . . "calls for an enterprise that exists and can continue to exist independently of and apart from the particular service relationship. The enterprise must be one that is stable and lasting—one that will survive the termination of the relationship." Gilchrist v. Div. of Emp't Sec., 48 N.J. Super. 147, 158 (App. Div. 1957). Therefore, part C of the "ABC" test is satisfied when an individual has a profession that will

15

plainly persist despite the termination of the challenged relationship. . . . When the relationship ends and the individual joins "the ranks of the unemployed," this element of the test is not satisfied. Schomp, 124 N.J.L. at 491-92.

[Hargrove, 220 N.J. at 306.]

In Carpet Remnant Warehouse, the Supreme Court explained the

determination should take into account various factors relating to the [workers'] ability to maintain an independent business or trade, including the duration and strength of the [workers'] businesses, the number of customers and their respective volume of business, the number of employees, and the extent of the [workers'] tools, equipment, vehicles, and similar resources. The Department should also consider the amount of remuneration each [worker] received from [the putative employer] compared to that received from other [business entities]. Those who received a small proportion of compensation from [the putative employer] are more likely to be able to withstand losing [the putative employer's] business.

[Id. at 592-93]

The Commissioner found MKI failed to address each of the factors enumerated by the Court in Carpet Remnant Warehouse, namely, the duration and strength of each therapist's business, the number of customers and the volume of business of each therapist, the extent of each therapist's business resources, and the amount of remuneration each therapist received from MKI compared with receipts from other employers. Further, crediting the testimony

16

and findings of the Department auditor, the Commissioner concluded the objective evidence showed therapists who created LLCs received all of their business income from MKI. These findings were supported by the substantial credible evidence in the record and were not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4508-17T3