**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1168-21

YOUR HOMETOWN TITLE, LLC,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT OF
LABOR AND WORKFORCE
DEVELOPMENT,

     Respondent-Respondent.

_____

Argued January 16, 2024 – Decided January 31, 2024

Before Judges Mawla, Marczyk, and Chase.

On appeal from the Department of Labor and Workforce Development, Docket No. DOL-20-007.

Adam Edward Gersh argued the cause for appellant (Flaster Greenberg, PC, attorneys; Adam Edward Gersh, on the briefs).

Achchana C. Ranasinghe, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Sue Arons, Assistant Attorney General, of counsel; Achchana C. Ranasinghe, on the brief).

Alan Lee Poliner argued the cause for amicus curiae New Jersey Land Title Association (Davison, Eastman, Muñoz, Paone, PA, attorneys; Alan Lee Poliner, on the brief).

PER CURIAM

Petitioner Your Hometown Title, LLC ("YHT") appeals from a November 8, 2021 final administrative action of the Commissioner of the Department of Labor and Workforce Development ("DOL") finding YHT responsible for contributions under the New Jersey Unemployment Compensation Law ("UCL"), N.J.S.A. 43:21-1 to -71, between 2015 and 2018.  Based on our review of the record and applicable legal principles, we affirm.

I.

YHT is a company that issues title insurance for property.  It also provides real estate settlement services and "closings."  In September 2018, the DOL audited YHT to determine whether it complied with the UCL by making appropriate contributions to the unemployment compensation and state disability benefit funds for the period between January 1, 2015 and December 31, 2018.

The audit revealed there were twelve individuals classified as independent contractors who should have been classified as employees, including title

abstractors, notaries, closers, and a cleaner. In August 2019, the DOL sent YHT a letter assessing $6,576.88, along with applicable interest and penalties, for unpaid contributions to the unemployment and disability funds because of the misclassification. The DOL later amended the assessment to $6,065.88.

In September 2019, YHT advised the DOL it was contesting the assessment and requested a hearing. The DOL referred the matter to a redetermination auditor who affirmed the assessment. YHT appealed the determination, and the case was transmitted to the Office of Administrative Law for a hearing before an administrative law judge ("ALJ").

In June 2021, the ALJ issued an initial decision. The ALJ found YHT did not satisfy the ABC test[1] regarding one of the twelve individuals, Helen Madrigali, who was a notary. The ALJ found Madrigali sometimes worked at YHT's office and received most of her income from YHT. The other eleven individuals were found to be independent contractors.

On November 8, 2021, following a de novo review of the record, the Commissioner issued a final administrative action. He agreed with the ALJ that Madrigali was an employee of YHT during the audit period, however, he

---

[1] As discussed below, the UCL sets forth the so-called ABC test for evaluating whether workers are employees or independent contractors. N.J.S.A. 43:21-19(i)(6)(A) to (C).

rejected the ALJ's determination as to the other eleven individuals. He found YHT did not meet the ABC test for any of the twelve individuals, and therefore, they were employees misclassified as independent contractors.

Under prong A of the ABC test, the Commissioner found YHT failed to meet its burden for the agents whose services it engaged during the audit period, in part because of an "Independent Vendor Services Agreement," "Vendor Services Agreements," "Witness Only Closer Instructions," and "Notary Signing Agent Code of Conduct." He also relied on the testimony of multiple witnesses who confirmed YHT had a degree of control over the agents, which he found "consistent with an employment relationship and belie[d YHT's] assertion that these individuals were free from control or direction by YHT."

The "Independent Vendor Services Agreement" that closers, notaries, and title abstractors were required to sign as a condition of performing services for YHT stated they were required to: "complete tasks in strict compliance" with YHT's "instructions and parameters"; "perform services" for YHT "within the specific time frame set forth" in YHT's instructions; advise YHT of "any inability or failure to complete any assignment as per the instructions provided" by YHT "immediately upon such inability or failure to complete any assignment"; maintain "errors and omissions insurance coverage in an amount

of not less than $1,000,000.00 per occurrence"; "not respond to, or take, any assignment to perform services hereunder unless" they could "perform such services in the time frame specified" and to "remain in contact with [YHT] regarding the status of services being performed"; "thoroughly read the Notary Signing Agent Code of Conduct" and "agree[] to adhere, abide and be bound" by same if they "provide[] notary or related services"; and shall "not assign or subcontract this Agreement or any rights or obligations hereunder without the prior written consent" of YHT.

Further, the Commissioner noted the "Vendor Services Agreement . . . contains instructions regarding the performance of the job for which the individual is being engaged by YHT[.]"  For example, the "Vendor Services Agreement" for title abstractors contains:  instructions regarding what the abstractor must report about the subject property; requirements for performing searches on prior owners of the subject property; how to submit reports of chain of title; what documents are required to be included in the search report; a minimum span of years to search for title documents; and a requirement to check for open mortgages and judgments.

5

Further, the services agreement for closers includes a document titled "Instructions for Witness Only Closer[s,]" which contains the following guidelines:

(1) "Maintain professionalism at all times. The dress code expected is 'business casual;'"

(2) "Contact customer prior to arrival to confirm your identity and time of arrival;"

(3) "Provide your photo ID to the customer to verify your identity;"

(4) "Obtain customer photo ID and complete information on the provided form;"

(5) "Have borrower(s) sign off on all judgments. If any belong to borrower(s), please call office immediately;"

(6) "Collect balance due on settlement sheet. Payments must be via a certified check made payable to Surety Title Company, LLC. Contact Surety Title Company, LLC for approval of personal check;"

(7) "Have borrower(s) fill out marital history on Affidavit of Title and please notarize this document;"

(8) "Advise borrower(s) that in most cases, it is the policy of Surety Title Company, LLC to send credit card payments directly to them for forwarding to their creditors;"

(9) "Have all borrower(s) sign all documents in the mortgage package EXACTLY as their names appear on the documents. Do not initial pages unless

6

there is a place on the page for initials, in which case borrowers must initial;"

(10) "Non-borrowing spouse must sign the Mortgage, Right-to-Cancel, Truth-In-Lending and Itemization of Amount Financed;"

(11) "Please keep package in the order received and return in that order;" and

(12) "Return package to our office in UPS envelope provided as soon as possible. Closings scheduled prior to 6PM must be sent out on the day of signing."

Additionally, the Commissioner noted, notary signing agents are required to sign a document titled "Notary Signing Agent Code of Conduct," which required the signing agents to agree to the "attached code of conduct and that the . . . Code of Conduct is incorporated into the Vendor Services Agreement . . . ."

The Commissioner found the above clauses reflect a "substantial degree of control" over the individual engaged with YHT. He found the fact the documents expressly state the individual engaged "shall" complete tasks "in strict compliance" with YHT's "instructions and parameters," which are enumerated in detail in the instructions, indicates a degree of direction and control inconsistent with the relationship between an independent contractor and a party that has engaged their services. The Commissioner rejected YHT's

A-1168-21

contention that the instructions and vendor services agreements are simply industry "best practices" and should not be considered indicia of control. He noted the decision to impose these requirements—regardless if they reflect best practices—at YHT's sole discretion without any input from the closers, notaries, or title abstractors, coupled with the substantive provisions in these documents, is the "very essence of direction and control." Therefore, the Commissioner determined YHT failed to satisfy prong A.

The Commissioner also found YHT failed to meet its burden on prong B regarding the closers and notary signing agents. He found it did not establish the services provided to YHT by the individuals,

> namely preparing closing documents, witnessing the signing of closing documents and executing post-closing requirements during real estate closings conducted at the location of YHT's clients, was either outside the usual course of business . . . or that such service was performed outside of all the places of business of the enterprise for which such service was performed.

He noted the Court in Carpet Remnant Warehouse, Inc. v. New Jersey Department of Labor defined "places of business" to mean "those locations where the enterprise has a physical plant or conducts an integral part of its business." 125 N.J. 567, 592 (1991). He found because one of the principal components of YHT's business is providing services during closings, the client

locations where services are performed are locations where YHT performs "an integral part of its business." Similarly, the performance of those services was performed within YHT's "usual course of business."

The Commissioner found YHT met its burden on prong B regarding the title abstractors. Although the abstractors' work is clearly within YHT's usual course of business, the Commissioner found "it is unfair to characterize the County Clerk's office, where [t]itle [a]bstractors perform abstracting services for YHT, as among YHT's places of business."

The Commissioner noted in order to satisfy prong C, YHT needed to prove "by a preponderance of the credible evidence with regard to each [c]loser, [n]otary [s]igning [a]gent[,] and [t]itle [a]bstractor whose services it engaged during the audit period that that individual was[,] during the audit period[,] customarily engaged in an independently established business or enterprise (not multiple employment)." Pursuant to Carpet Remnant, this meant

> relative to each [c]loser, [n]otary [s]igning [a]gent[,] and [t]itle [a]bstractor whose services YHT engaged . . . it must address the duration and strength of each individual's business during that period, the number of customers and their respective volume of business during that period, the number of employees of the individual's business or enterprise during that period, the extent of each individual's business resources during that period and, perhaps most importantly, the amount of remuneration each individual received from

YHT during that period compared to that received from others.

The Commissioner found YHT met its burden for all the individuals, with the exception of Madrigali. He explained the closers, notaries, and title abstractors engaged in "legitimate independent business enterprises . . . without employees and without much in the way of 'tools, equipment, vehicles and similar resources.'" He further noted these individuals engaged by YHT only earned between one and twenty-eight percent of their Schedule C income in their roles at YHT during the audit period and the balance of their income from other clients. Further, "[t]hese individuals held themselves out as being available to perform the subject services on a fee-for-service basis and performed those services for multiple clients over the course of multiple years during the audit period." On the other hand, Madrigali received eighty-eight percent of her Schedule C income from YHT.

As for Saida Yusupova, who provided cleaning services for YHT, the Commissioner found YHT met its burden as to prongs A and B, but not prong C. He noted YHT merely submitted a single invoice, and no other evidence, to suggest she provided cleaning services for other clients. Noting that it was

10

YHT's burden[2] to prove Yusupova was an independent contractor, he observed YHT failed to rebut the presumption of employment that arose when the individual's services were provided for remuneration.

The Commissioner dismissed YHT's appeal, and it was ordered to remit $6,065.88 to the DOL for the years 2015 through 2018 in unpaid unemployment and disability contributions, along with applicable interest and penalties. This appeal followed.

## II.

## A.

YHT argues it presented sufficient evidence proving the individuals it engaged for work met the ABC test. It relies on East Bay Drywall, LLC v. Department of Labor and Workforce Development, 467 N.J. Super. 131, 150-51 (App. Div. 2021), where we addressed prong A as follows:

> Among other things, we find noteworthy the ability of the installers to decline proposed projects offered by East Bay, the absence of significant direction and supervision by East Bay at the job sites, the autonomy of the installers in deciding how many workers to enlist to complete the work, and the installers' furnishing of their own tools and equipment while East Bay supplied the drywall and materials.

---

[2] The DOL unsuccessfully attempted to obtain Yusupova's tax returns, but it was not its burden to prove she was not customarily engaged in an independently established trade.

Though East Bay was reversed,[3] YHT contends this reversal was based on prong C and this court's prong A and B analysis was not reversed.

YHT also likens this case to the facts in Trauma Nurses, Inc. v. New Jersey Department of Labor, because it argues the testimony showed all the individuals could accept or decline assignments, were not subject to any material "direction and supervision," and had autonomy on how to complete their work. 242 N.J. Super. 135, 147 (App. Div. 1990). Further, the individuals set their own pricing and profited from their own businesses.

YHT argues the agreements upon which the Commissioner relied were not implemented until 2017, despite the fact that the DOL challenges the contractor status of the individuals for years 2015-2016. Moreover, John DeSantis, vice president of finance for Surety (the company that owns YHT), testified the standards set forth in the documents simply reiterate industry standards. YHT concedes the agreement included a required dress code but contends "it did not impose a dress code or have any material control over how the work was done."

YHT argues the requirement that individuals engaged in work with the company maintain insurance demonstrates they operate a separate business. As

---

[3] East Bay Drywall, LLC v. Dep't of Labor & Workforce Dev., 251 N.J. 477 (2022).

DeSantis testified, if a title policy becomes the subject of litigation, frequently all businesses involved in the transaction may be named. YHT asserts it was merely making sure the individuals had sufficient insurance so that it would not be the only defendant in such an action. YHT contends the above facts demonstrate it met prong A, and the workers at issue are not employees.

As to prong B, YHT argues all work was performed exclusively outside of its place of business. Because prong B can be proven by either showing the service is outside of the usual course of business or that it is performed outside of the places of business of the enterprise for which the service is performed, YHT contends the Commissioner's conclusion that conducting closings and abstracting titles outside of the office is integral to YHT's business is not legally dispositive. YHT states it does not offer these services to the public but hires vendors to perform the service for it so it can, in turn, sell title insurance. It further contends it hires other outside companies to conduct judgment searches, but that type of service is also outside the scope of its business.

With respect to prong C, YHT argues the Commissioner erred in finding Madrigali and Yusupova did not meet the standard under the ABC test. Madrigali testified she eventually began working nearly exclusively with YHT and turning down other assignments, but YHT contends this was her choice

13

based on mere preference, and Madrigali still took assignments from other companies when she worked more.

YHT argues that even though Yusupova performed her work onsite, she did not perform work integral to YHT's business. Yusupova had her own business "and was not even available to clean other offices for YHT affiliates because she had so many other clients."

Amicus curiae New Jersey Land Title Association ("NJLTA") argues the Commissioner misapplied the facts in pursuit of a new agenda of the DOL.[4] NJLTA asserts the Commissioner's final decision came months after these bills became law, and therefore "it seems that policy (or political) considerations got in the way of an objective assessment of the facts in this case."

NJLTA argues the Commissioner substituted his judgment for that of the ALJ without factual support, and therefore no deference should be given to his final decision. It further asserts the Commissioner relied on the "Notary Signing

---

[4] NJLTA points to legislation enacted in July 2021 to "crack down" on employers who misclassify independent contractors as employees. Specifically, it references Pub. L. 2021, ch. 165 ("AN ACT concerning enforcement of various laws regarding employee misclassification"); Pub. L. 2021, ch. 166 ("AN ACT concerning the establishment of the 'Office of Strategic Enforcement and Compliance' in the Department of Labor and Workforce Development"); and Pub. L. 2021, ch.167 ("AN ACT concerning employee misclassification and insurance fraud").

Agent Code of Conduct," which was not part of the record. That code only refers to standards of honesty and fidelity. It asserts industry standards and codes of conduct are not the same as instructions. It further argues the Commissioner's reliance on same is arbitrary and capricious.

NJLTA contends the Commissioner gave too much weight to portions of the "Independent Vendor Services Agreement" clauses and disregarded the ALJ's evaluation of this agreement. NJLTA asserts the clauses in the agreement pertaining to time frames to complete an assignment represent a deadline which is out of the title agent's control. It notes the buyer and seller of a property have a contract with a set date to close the sale, and if the date is not met, the sale can be canceled. Thus, this time frame is not controlled by YHT.

NJLTA argues the clause prohibiting assignment or subcontracting of the work supports independent contractor status as well. This clause merely prevents individuals in the profession, chosen to do the work, from assigning the work to another with lesser or unknown qualifications and experience. NJLTA asserts the Commissioner made superficial conclusions by focusing on language in the contractor agreements such as "instructions" and "parameters." It argues the final decision chooses form over substance, though it is clear the instructions or parameters refer to "what to do" rather than "how to do it."

A-1168-21

NJLTA also argues the ABC test was met. It argues prong A was satisfied because the closers, notaries, and abstractors are free from control or direction from YHT, primarily for the reasons found by the ALJ. Further, they point to the Supreme Court's statement in <u>East Bay</u> that "a certificate of insurance could be a significant indication of independence because an employer is generally not vicariously liable for the negligent acts of the contractor in the performance of the contract, . . . and insurance policies issued to employers often exclude coverage for the acts of independent contractors." 251 N.J. at 499 (internal quotation omitted). Here, NJLTA argues employee status is negated by virtue of the individuals carrying their own insurance.

As to prong B, NJLTA contends the Commissioner incorrectly found that the principal components of YHT's business are providing notary and closing services. It argues the principal business of YHT, and all title agents, is providing title insurance. The services provided by these individuals are merely ancillary to the insurance service. Because the services are not an integral part of YHT's business, NJLTA contends the closing and notary services performed outside of YHT's location meet prong B.[5]

---

[5] Because the Commissioner found prong C was met for all of the closers, notary signing agents (except Madrigali), and title abstractors, NJLTA did not address this prong.

The DOL counters the Commissioner properly held YHT failed to meet prong A's requirements for the title abstractors, notaries, and closers and that the agreement he relied upon in coming to this conclusion had ample support. Not only did all the individuals engaged by YHT sign the agreement, they were also required to adhere to role-specific addendums to the agreement which contained specific "instructions and parameters" they were required to comply with. As such, the DOL argues the degree of YHT's control over the abstractors, notaries, and closers meets the "some level of control" standard for prong A established in Carpet Remnant, 125 N.J. at 582-83, and Hargrove v. Sleepy's, LLC., 220 N.J. 289, 305 (2015).

The DOL asserts that although YHT argues the instructions given to the engaged individuals reflect industry standards in practice, this contention ignores the fact YHT still elected to adopt the instructions, thereby mandating compliance with them as a condition of providing services for YHT. Moreover, the instructions adopted by YHT are not codified in the New Jersey Administrative Code, and they are neither authoritative nor required. Rather, requiring the individuals to comply with these instructions was a means of exercising control over the way they perform jobs. As such, the DOL argues YHT failed to meet the burden under prong A.

A-1168-21

The DOL further argues YHT did not meet its burden under prong B as to the notaries and closers. It argues the subject notaries and closers provide the same services as YHT's "internal closers" and therefore, it is within the "usual course" of business of YHT. Though the closers and notaries here perform closing services at client locations, it is an integral part of its business under Carpet Remnant, 125 N.J. at 592. As such, the DOL argues the Commissioner correctly found prong B was not met by YHT.

B.

The scope of our review is narrow. Appellate courts review decisions "made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." East Bay, 251 N.J. at 493 (citing Hargrove, 220 N.J. at 301-02). That enhanced deference stems, in part, from "the executive function of administrative agencies . . . ." Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 25 (1995). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). The reviewing court "does not substitute its judgment of the

facts for that of an administrative agency." Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587 (2001) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 587 (1988)). Rather, the reviewing court "defer[s] to matters that lie within the special competence" of the administrative agency. Balagun v. N.J. Dep't of Corr., 361 N.J. Super. 199, 202 (App. Div. 2003) (internal citation omitted). The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

On appeal, the judicial role in reviewing an administrative action is generally limited to three inquires:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law;
>
> (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and
>
> (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

19

"When an agency's decision meets those criteria, then a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." In re Herrmann, 192 N.J. 19, 28 (2007).[6]

Turning to substantive legal principles, the statutory framework at issue in this appeal, the UCL, N.J.S.A. 43:21-1 to -71, "was designed to act as a cushion 'against the shocks and rigors of unemployment.'" East Bay, 251 N.J. at 494 (quoting Carpet Remnant, 125 N.J. at 581). Whether a putative employer is required to pay into an unemployment benefits fund under N.J.S.A. 43:21-7, turns on whether its workers are employees or independent contractors. Id. at 484-85. Importantly, "[b]ecause the statute is remedial, its provisions have been construed liberally, permitting a statutory employer-employee relationship to be found even though that relationship may not satisfy common-law principles [of

---

[6] Furthermore, "where there is substantial evidence in the record to support more than one regulatory conclusion, it is the agency's choice which governs." In re Adoption of Amends. to Ne., Upper Raritan, Sussex Cnty., 435 N.J. Super. 571, 583 (App Div. 2014) (quoting Murray v. State Health Benefits Comm'n, 337 N.J. Super. 435, 442 (App. Div. 2001)). "If the Appellate Division is satisfied after its review that the evidence and the inferences to be drawn therefrom support the agency head's decision, then it must affirm even if the court feels that it would have reached a different result itself." Id. at 584 (quoting Clowes, 109 N.J. at 588).

employment]."  Id. at 494 (second alteration in original) (quoting Carpet Remnant, 125 N.J. at 581).

The UCL sets forth the ABC test for making that determination.  Id. at 495; N.J.S.A. 43:21-19(i)(6)(A) to (C).  Any service performed for renumeration under any express or implied contract is presumed to be employment unless the ABC test is satisfied.  East Bay, 251 N.J. at 495.  The statutory test reads:

> Services performed by an individual for renumeration shall be deemed to be employment . . . unless and until it is shown to the satisfaction of the division that:
>
> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact;
>
> (B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and
>
> (C) Such individual is customarily engaged in an independently established trade, occupation, profession or business.
>
> [N.J.S.A. 43:21-19(i)(6).]

Because the statutory ABC test is formulated in the conjunctive and presumes that services for renumeration constitute employment, the party

21                                                              A-1168-21

challenging the DOL's determination of an employer-employee relationship has the burden of "establish[ing] the existence of all three criteria." East Bay, 251 N.J. at 495 (quoting Carpet Remnant, 125 N.J. at 581) (emphasis added). The ABC test "is fact-sensitive, requiring an evaluation in each case of the substance, not the form, of the relationship." Id. at 496 (quoting Carpet Remnant, 125 N.J. at 581). "The factfinder must look beyond the employment contract and the payment method to determine the true nature of the relationship." Ibid.

Prong A, known as the "control test," requires proof "that the provider of services 'has been and will continue to be free from control or direction over the performance of such services.'" Carpet Remnant, 125 N.J. at 582 (quoting N.J.S.A. 43:21-19(i)(6)(A)). "The person must establish not only that the employer has not exercised control in fact, but also that the employer has not reserved the right to control the individual's performance." Ibid.

Here, the Commissioner reasonably classified the closers, notary signing agents, and title abstractors as employees of YHT, rather than as independent contractors, under the ABC test. With respect to prong A, the record substantiates the Commissioner's finding that individuals at issue were subject to a sufficient degree of control to be classified as employees. For example, YHT's instructions for the title abstractors were detailed in nature and provided

22

specific directions for addressing open or unsatisfied mortgages or deeds of trust to institutional lenders; when to perform a search on the prior owner of a property; when to perform a "bring-down" search; and what must be included in a chain of title search. Specific corresponding instructions were also provided for witness-only closers. All of these tasks were required to be completed "in strict compliance" with YHT's "instructions and parameters."

YHT argues the agreements upon which the Commissioner relied were not implemented until 2017, despite the DOL challenging the contractor status for the subject individuals for years 2015-2016. However, the Commissioner did not just rely on these documents. The Commissioner noted he relied on "the testimony of witnesses confirming the practices of YHT" and "reflect[ing] a degree of control over the [c]losers, [n]otary [s]igning [a]gents, and [t]itle [a]bstractors that is consistent with an employment relationship and belies [YHT's] assertion that these individuals were free from control or direction by YHT." Moreover, YHT bears the burden under the statute to satisfy the ABC test, and there is no indication that its guidelines or requirements for the individuals at issue were materially different in the years 2015 to 2016 despite the lack of a prior written agreement.

Furthermore, we recognize YHT and NJLTA have advanced arguments in support of prong A, such as the workers' ability to decline assignments, set their own prices, and furnish their own equipment. However, "[i]n establishing control for purposes of part A of the test, it is not necessary that the employer control every aspect of the worker's trade; rather, some level of control may be sufficient." Hargrove, 220 N.J. at 305. Moreover, our role is not to assess prong A or the other prongs de novo. That is, we do not substitute our judgment for that of the Commissioner. Campbell, 169 N.J. at 587 (citation omitted). Rather, we must determine if YHT has made a clear showing the Commissioner acted in an arbitrary, capricious, or unreasonable manner or that its decision lacked fair support in the record. Saccone, 219 N.J. at 380 (quoting Russo, 206 N.J. at 27). We are unconvinced YHT has made such a showing.

The facts in Trauma Nurses are distinct from this case. The employer there was akin to an agency who provided nurses to hospitals on a temporary basis. 242 N.J. Super. at 137. The nurses there were not obligated to adhere to a specific set of rules imposed by their employer, but rather they were required to comply with the policies and procedures of the institution where they were placed. Id. at 144-45. Here, the workers were required to comply with YHT's specific vendor services agreement and "instructions and parameters"

24

implemented by YHT, not an outside institution. These requirements imposed on the workers by YHT support the ALJ's determination that the workers were employees, not independent contractors.

We further observe that both YHT and NJLTA rely on the ALJ's analysis of the facts and legal conclusions. However, those findings are not binding on the Commissioner. In re Adoption of Amends., 435 N.J. Super. at 587. The Commissioner's findings as to prong A were not plainly unreasonable and were based on substantial evidence, and we must defer to those findings when supported by the record, which was the case here.

Given our conclusion YHT failed to satisfy prong A, we need not address the Commissioner's analysis as to prongs B and C regarding the closers, notary signing agents, and title abstractors. We do briefly address prong C as it applies to Yusupova. Although YHT claimed Yusupova had her own business, the Commissioner determined YHT failed to submit sufficient evidence to rebut the presumption of employment. Despite YHT having the burden to prove prong C as to Yusupova, the DOL attempted to secure her tax returns to evaluate her employment status. Those efforts were unsuccessful. The Commissioner noted the DOL did not have to establish that Yusupova was customarily engaged in an independently established trade. That was YHT's burden. YHT's failure to

demonstrate her "UCL-exempt status" was fatal to YHT's attempt to establish prong C. The Commissioner's finding that Yusupova did not meet the prong C test was also supported by the record and was not arbitrary or capricious.

We discern no basis to disturb the Commissioner's conclusions in this matter. To the extent we have not otherwise addressed them, all other arguments raised by the parties on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1168-21