**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0462-24

COVERALL NORTH AMERICA,
INC.,

     Petitioner-Appellant,

v.

NEW JERSEY DEPARTMENT OF
LABOR AND WORKFORCE
DEVELOPMENT,

     Respondent-Respondent.

_____

Argued April 27, 2026 – Decided May 21, 2026

Before Judges Sabatino, Natali and Bergman.

On appeal from the Commissioner, Division of Unemployment Insurance, Department of Labor and Workforce Development, Agency Docket No. DOL 16-004.

Norman M. Leon (DLA Piper LLP (US)) of the Illinois and New York bars, admitted pro hac vice, argued the cause for appellant (DLA Piper LLP (US), attorneys; David S. Sager and Norman M. Leon, on the briefs).

Nadya Comas, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Sookie Bae-Park, Assistant Attorney General, of counsel; Daniel Resler, Nadya Comas, Yael Fisher, and Sara Vasquez, Deputy Attorneys General, on the brief).

PER CURIAM

Coverall North America, Inc. ("Coverall") appeals a September 9, 2024 final agency decision of the Commissioner of the Department of Labor and Workforce Development ("the Department") reversing an Administrative Law Judge's ("ALJ's") decision dated April 24, 2024, in Coverall's favor.

The Commissioner determined that Coverall owed more than $1 million in unpaid contributions and interest as required by the New Jersey Unemployment Compensation Law ("UCL"), N.J.S.A. 43:21-1 to -71. The Commissioner concluded Coverall was the employer of janitorial cleaners and failed what is commonly known as "the ABC Test" for independent contractor status.

For reasons that we explain herein, we remand the final agency decision to address two important points concerning the control of pricing and the independence of certain individual cleaners.

I.

Because we are remanding the case, we need not describe the facts here definitively or comprehensively. A short summary will suffice. Before doing so, we set forth some basic facets of the applicable statutory scheme.

A.

The UCL requires that employers meeting applicable criteria are obligated to pay certain contributions to the Unemployment and Disabilities Insurance Funds. N.J.S.A. 43:21-7. Administered by the Department, the program assures that critical benefits are available to support workers during periods of unemployment and temporary disability. Ibid.; see also N.J.A.C. 12:17-1.1.

N.J.S.A. 43:21-19(i)(6) provides that "[s]ervices performed by an individual for remuneration shall be deemed to be employment" under the UCL unless it is shown by an alleged employer that:

> (A) Such individual has been and will continue to be free from control or direction over the performance of such service, both under his contract of service and in fact;
>
> (B) Such service is either outside the usual course of business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

A-0462-24

(C)   Such individual is customarily engaged in an independently established trade, occupation, profession or business.

This three-part standard is commonly known as the "ABC Test."[1]

The ABC Test becomes applicable only after it is determined that the service provided constitutes employment, defined as "service . . . performed for remuneration under any contract of hire, written or oral, express or implied." N.J.S.A. 43:21-19(i)(1)(A); Carpet Remnant Warehouse, Inc. v. N.J. Dep't of Lab., 125 N.J. 567, 581 (1991) ("Carpet Remnant").  The concept of remuneration under the ABC Test is defined as "all compensation for personal services."  N.J.S.A. 43:21-19(p).

The question often presented in disputed cases is whether the workers at issue performed services for the alleged employer for remuneration.  In such an inquiry, the court "will look behind the contract to the actual situation—the status in which the parties are placed by the relationship that exists between

---

[1]  As we discuss in our factual discussion, the version of the ABC Test pertinent to this case is the version that existed in the audit period from 2006-2008. Recently, the Department prospectively revised the ABC Test regulations distinguishing employees from independent contractors.  The new ABC Test will become effective October 1, 2026, and the change does not affect this appeal.  See 57 N.J.R. 894(a) (rule adoption notice).

A-0462-24

them." Gilchrist v. Div. of Emp. Sec., Dep't of Lab. and Indus., 48 N.J. Super. 147, 154 (App. Div. 1957).

Over the years, case law applying the UCL has examined whether the circumstances (1) involve "remuneration" and, if so, (2) whether the alleged employer has proven all three criteria for exclusion under the ABC Test. See, e.g., E. Bay Drywall, LLC v. N.J. Dep't of Lab. and Workforce Dev., 251 N.J. 477, 495 (2022) (holding the Department had correctly classified certain drywall installers as employees rather than independent contractors, and reversing a contrary conclusion reached by the Appellate Division); Carpet Remnant, 125 N.J. at 573-74 (holding that carpet installers were not employees of a carpet retail company where, among other things, the company posted installation jobs for the installers but they were not obligated to accept them, the installers could and did work for other carpet retailers, the installers supplied their own tools, and the company did not control how the installations would be performed); Trauma Nurses, Inc. v. Bd. of Rev., 242 N.J. Super. 135, 137 (App. Div. 1990) (holding that the Department had incorrectly classified nurses as an agency's employees, where the agency had temporarily placed nurses at hospitals but had not exercised any control or direction over them).

A-0462-24

The parties both cite to AC&C Dogs, LLC v. New Jersey Dep't of Lab., 332 N.J. Super. 330, 332 (App. Div. 2000), in which a company that rented hot dog carts to vendors, who then cooked and sold hot dogs to the public, was held liable by the Department for the payment of unemployment taxes. Generally, the carts came equipped with hot dogs, buns and condiments; however, the company did not require that the vendors purchase their food supplies from it. Id. at 333. The vendors were free to set their own prices and to expand the menu at whatever prices they deemed to be appropriate. Ibid. The hot dogs were in no way identified as coming from the company and the vendors were not required to display any company identification. Id. at 334. In addition, the company had no power to control the manner or the location where the vendors conducted their business. Ibid.

We held in AC&C Dogs that the vendors were not providing a service to the company in exchange for remuneration. Id. at 336. We noted that the company did not sell the hot dogs to the public but rather received money from the vendors in the form of a rental charge and the cost of supplies. Ibid. The money the vendors received was from the public, not from the company. Therefore, the company was not responsible for paying unemployment taxes. Ibid.

A-0462-24

B.

In reviewing on appeal such agency applications of the ABC Test, our courts have customarily afforded substantial deference to the Department. See, e.g., E. Bay Drywall, 251 N.J. at 496-501 (upholding the Department's finding of employee status). Such deference aligns with the general principles of deference in reviewing actions by administrative agencies. Traditionally, an administrative agency's decision generally may not be disturbed unless it is shown to be arbitrary, capricious or unreasonable. Brady v. Bd. of Rev., 152 N.J. 197, 210 (1997). In reviewing the factual findings of the agency, the standard is not whether the appellate court would come to the same conclusion, but rather whether there was substantial credible evidence in the record to support the factfinder's conclusion. Ibid. The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable is on the party challenging the administrative action. E.S. v. Div. of Med. Assistance & Health Servs., 412 N.J. Super. 340, 349 (App. Div. 2010).

Deference to the Commissioner's findings of fact is generally appropriate when those findings are based on sufficient credible evidence in the record. Lourdes Med. Ctr. of Burlington Cnty. v. Bd. of Rev., 197 N.J. 339, 367 (2009). However, where an agency rejects an ALJ's findings of fact, the appellate court

"need not give the agency the deference we ordinarily accord on review of final agency decisions." A.M. v. Monmouth Cnty Bd. of Soc. Servs., 466 N.J. Super. 557, 565 (App. Div. 2021) (citing H.K. v. State, Dep't of Hum. Servs., 184 N.J. 367, 384 (2005)).

C.

The facts in this case were developed over the course of three days of hearings before the ALJ. The case grew out of an audit of Coverall by a Department auditor for the calendar years 2006, 2007, and 2008. After the auditor concluded from records and survey responses that Coverall had misclassified numerous cleaners (also called "franchisees") as independent contractors, Coverall contested the audit findings and requested an administrative hearing. The ALJ considered numerous documents, including form agreements created and used by Coverall. The ALJ also heard testimony from two key witnesses: (1) the Department's auditor, and (2) Coverall's chief operating officer, Shirley Yvonne Klein.

As it has described itself in advertising, Coverall is a janitorial service company located in Florida, with forty-six regional offices throughout the country. It has been in business since 1985.

Klein testified that Coverall is a "sales and marketing company" that sells and markets "commercial cleaning franchises." She further described the company as an "account broker" for the franchise owners, which provides "a billing and collection service for those franchise owners and general support [and] initial training." The training period apparently covers all aspects of running and operating a business. Thus, according to Klein, Coverall sells a "franchise" and licenses its trademark but does not itself do any commercial cleaning. Coverall utilizes sales representatives to obtain new accounts.

All of the cleaners engaged in business with Coverall sign a janitorial service agreement. Under that form agreement, Coverall grants the cleaner the right to use Coverall's license and trademark. All cleaners were required to pay Coverall an initial fee of between $10,000 and $37,000, based on the anticipated volume of business. Coverall required a downpayment of forty to fifty percent and offered financing for the balance. Of that fee, $5,000 was allocated for permission to use Coverall's license. The agreement was to last for twenty years. Coverall had the right to audit a cleaner's business records and, upon request, to examine the cleaner's customer list.

Coverall's form janitorial franchise agreement stated that the cleaners were "independent contractors." The cleaners were permitted to have their own

9

business cards and to advertise their services but were required to use Coverall's trademark and logo when doing so. The cleaners were required to attend a training course before beginning operation.

The janitorial franchise agreement also contained a post-termination covenant not to compete with Coverall or any of its other franchisees for an eighteen-month time-period by having any financial interest in any business that performs building cleaning and maintenance services in a one-hundred-mile radius of Coverall's regional office in which the franchisee had been affiliated, or any county located partially or entirely within, or contiguous to, that regional office, whichever was greater. The covenant also barred the signee from diverting any "cleaning accounts which were being serviced by Coverall franchisees" during the year preceding termination.

The record also contained a franchise disclosure document, another form created and used by Coverall. In it, the prospective franchisee was informed that the investment needed to obtain a franchise was "$10,612 to $37,345, depending on the package size [chosen]."

In addition, the record contains a sample franchise business service agreement that cleaners could use with their customers. Among other things,

10

that agreement stated that Coverall would bill the customer on a monthly basis on behalf of the cleaner.

Also included was a service agreement whereby the customer was asked to acknowledge that Coverall was delegating the service to be performed to one of its franchisees.

Coverall required the cleaners to adhere to certain "brand standards" in their cleaning, including equipment and chemicals. They could purchase the equipment and cleaning supplies from a janitorial supply company or purchase it through Coverall.

Klein asserted that Coverall does not supervise the cleaners' operations or conduct an inspection as to the quality of their performance. Coverall did require the cleaners to obtain their own general liability and workers' compensation insurance.

As a key facet of its operations, Coverall provided billing and collection services to its franchisees. The risk of loss from non-payment was on the cleaners. Franchisee customers pay Coverall directly for the cleaning service provided by the franchisee; appellant then subtracts and retains a fifteen percent royalty fee and remits the balance to the franchisee.

11

The auditor, meanwhile, had a differing assessment of Coverall's business. The auditor concluded that the cleaners were appellant's employees. She described them as appellant's "agents" or "conduits."

In particular, the auditor concluded that Coverall had failed to satisfy part B of the ABC Test because it controlled the services performed by the cleaners, and directed where the cleaners were to go to provide cleaning services as well as the methods of payment. The auditor also found that Coverall failed to satisfy part C of the test because the arrangement was more similar to an individual paying money to an employment agency to find a job than it was to a franchise. She further noted that most of the cleaners had no business location other than their homes and had to set up the business in order to obtain a contract with Coverall. In addition, she found that the cleaners did not have control over the work assignments and that they were subject to audit by Coverall. Moreover, when the cleaners obtained non-appellant business, they were required to notify Coverall.

The auditor further concluded that Coverall had provided "remuneration" to the cleaners for their services because it had provided them with 1099 forms.

All told, the auditor concluded that Coverall owed the State $577,405.47 for 2006, $325,390.96 for 2007, and $443,144.54 for 2008. For the 2006 to

12

2008 tax years, Coverall owed $958,115.90 in unemployment contributions, together with $387,825.07 in interest, for a total of $1,345,940.97.

An updated audit through March 2022 substantially increased that figure, based on interest, to nearly $3 million.

D.

Sifting through this evidence and the parties' competing contentions, the ALJ found that appellant had satisfied the ABC Test. The ALJ agreed with Coverall that it essentially acted as a "conduit for payment to its franchisees." The ALJ did not, however, make an explicit finding about the term "remuneration."

As to part A, the ALJ found that Coverall did not exert sufficient control over the cleaners' businesses to make them employees. The ALJ concluded that under the franchise disclosure agreement:

> Franchisees are free to accept or reject offered contracts. Once accepted, the franchisee owns the account, which they are free to service without interference from Coverall or sell the account, if they cho[o]se. Franchisees do not submit any information to Coverall regarding the services they perform.

Turning to part B, the ALJ found that Coverall had satisfied that element because it was not in the business of performing cleaning services; thus, its business was "different from its franchisees." The ALJ further noted in this

13

regard that the locations where the contractors performed their cleaning services were not owned or controlled by Coverall.

Lastly, the ALJ found that Coverall had satisfied part C because it established that the contractors "committed to a significant financial investment in their business which provided them with a twenty-year renewable franchise relationship with Coverall." In addition, the contractors were required to maintain a "significant amount of insurance coverage."

## E.

In his final agency decision reversing the ALJ, the Commissioner[2] first noted that Coverall had failed to satisfy part C because it did not prove that each of the commercial cleaners whose services it engaged during the audit period "customarily engaged in an independently established business or enterprise." He found that Coverall had "failed to demonstrate that the commercial cleaners were engaged in a business that could have continued to exist independently and apart from their relationship with Coverall."

The Commissioner noted that while Klein testified generally as to Coverall's business model, "nowhere within [her] testimony d[id] she address"

---

[2] As of the date of the appellate oral argument, April 27, 2026, a new Commissioner had been nominated but not yet confirmed.

any of the part C factors, namely, the duration and strength of any of the contractors' businesses, the number of their customers, the volume of the businesses, the number of their employees, and the amount of remuneration they received from appellant compared to that received from others. According to the Commissioner, none of Coverall's exhibits addressed any of these factors. Thus, he concluded that Coverall had "fallen woefully short of meeting its burden" under part C.

Although the Commissioner stated that he did not need to address parts A and B because of the failure of proof under part C, he went on to complete the analysis and address those parts anyway.

As to part A, the Commissioner ruled that Coverall had not demonstrated that the cleaners were free from Coverall's direction and control. Rather, the Commissioner found the "overwhelming weight of the evidence" supported the contrary.

Specifically, the Commissioner cited the degree of control contained in the janitorial franchise agreement, including that the cleaners could only conduct their services where Coverall conducted its business; Coverall's guarantee for the initial year of the cleaners' business only applied to customers lost through no fault of the cleaners; the fact that Coverall had the exclusive right to perform

15

all billing for services and supplies provided by the cleaners; customer accounts were delegated by Coverall to the cleaners to service; and the agreement contained an eighteen-month non-competition clause.

Regarding part B, the Commissioner determined that Coverall had not established that "the services at issue [were] either outside the usual course of business for which such services are performed, or that the services [were] performed outside of all the places of business of the enterprise for which such services are performed."  He concluded:

> [S]ince the principal part of Coverall's business enterprise is providing commercial cleaning services to Coverall's customers and the customers of Coverall's agents, the work sites where those services are performed are locations where Coverall conducts an "integral part of its business," and are, therefore, among Coverall's "places of business."

Thus, the Commissioner found that the performance of the services by the commercial cleaners "engaged by Coverall is a service performed within, not outside of, Coverall's usual course of business."

Finally, as to part C, the Commissioner noted that, since Coverall has the burden of proving all three prongs of the ABC test are in its favor, "the Department is under no statutory or other obligation to obtain documentation

16

addressing the Prong 'C' factors directly from the commercial cleaners engaged by Coverall during the audit period . . . ."

## II.

In this appeal, Coverall urges that we reverse the final agency decision for several reasons. Preliminarily, it argues that the cleaners did not receive any remuneration from Coverall, reiterating its theme that it was a mere "conduit" of monies paid by customers. In addition, Coverall argues the Commissioner misapplied the ABC Test to the record, arguing that it proved all three parts of the test at the hearing. Lastly, Coverall contends that the doctrine of estoppel undercuts the Commissioner's final agency decision, because the Department had classified one of the cleaners in a previous wage-and-hour proceeding involving the year 2009 as an employer rather than as an employee.[3]

## A.

An important control-related factual point that materially bears upon the overall analysis under the ABC Test is the degree of control that Coverall

---

[3] We summarily reject that legal argument, as the 2009 matter involved a different statute than the UCL, and the present audit occurred after that matter. In addition, the law does not preclude the possibility that an individual can be an employee in one context but functioning as an employer in another. The case before us concerns the status of the cleaners, not their own status vis-à-vis any persons who may, in turn, work for them.

exercised over <u>customer pricing</u>. For reasons we are about to explain, such pricing control is not satisfactorily addressed by the ALJ's decision, nor by the Commissioner's final agency decision. The parties also continue to disagree about that control issue, and the significance of information in the record concerning it.

To frame our discussion on this point, we note that case law illustrates that a putative employer's degree of control over the prices charged to a customer can be relevant to the ABC analysis. For instance, as the ALJ pointed out, our conclusion in <u>Trauma Nurses</u>, 242 N.J. Super. at 138-44, that the appellant acted as a mere "conduit" of money paid to the individual nurses was supported by the fact that, as the ALJ put it, "[e]ach nurse negotiated her hourly rate," and then the appellant issued checks to the nurses "based on their shifts and their hourly rate."

Likewise, in <u>AC&C</u>, 332 N.J. Super. at 333, our analysis hinged in part upon the fact that the hot dog vendors were free to set their own prices and to expand the menu at whatever prices they deemed to be appropriate. Under that arrangement, we concluded the vendors had not received "remuneration" from the company that had rented the vendors the hot dog carts. <u>Id.</u> at 336.

18

In E. Bay Drywall, the drywall company, which the Supreme Court classified as the workers' employer, established pricing through bids it conveyed to builders. 251 N.J at 486. Once a bid was accepted by a builder, the company would then arrange for workers to install the drywall. Ibid. Notably, the workers were "free to accept or decline" those projects. Ibid. Even so, the Court upheld the Commissioner's finding that they were the company's employees. Id. at 485-86.

Here, the ALJ's decision did not explicitly make a finding about Coverall's alleged control over initial pricing with a customer, except to note that the relationship with a customer was established in a Service Agreement with Coverall. The ALJ further noted, without specifically mentioning pricing, that "[f]ranchisees are free to accept or reject offered contracts."

The Commissioner's final agency decision likewise does not make a specific conclusion on the control-over-pricing issue, except to note in its recitation of the parties' positions that the Department's exceptions to the ALJ's decision included an assertion that "Coverall sets the prices that are charged for the services." On that point, the decision cites to Exhibit R-5, which contains a sample form agreement with one of the cleaners.

On appeal, the Commissioner continues to assert in his merits brief that Coverall "determined the cleaners' rates of pay," "dictates the terms and rates of payment," and "exercised substantial control over the cleaners' pay." The Commissioner reiterated similar contentions to us in a post-argument submission.

Meanwhile, Coverall maintained—in both its merits briefs and post-argument submission—that it does not control pricing. Coverall acknowledges that its sales representatives establish with customers prices for the services, but that cleaners are free to accept or reject the proposed contracts. If they do accept, then Coverall generally assigns the service contract to the cleaner. Coverall also contends that cleaners are free to independently solicit their own customers, provided that Coverall's own contract forms are used.

The record supplied to us is unfortunately mixed and incomplete on this issue. The standard form Service Agreement and the samples provided in the appendices do reflect that Coverall and the customer, without the participation of a cleaner, enter into terms that specify the prices to be charged, the cleaning services to be provided, and the frequency of cleanings. The record also shows that cleaners are free to accept or reject being assigned such customer-specific contracts.

20

The record is unclear, however, about the true extent that a cleaner can renegotiate a different price. According to the testimony of Klein, if a cleaner thinks a customer is "not paying enough for the services [being provided]," the cleaner can renegotiate a higher price without Coverall's permission. However, Klein was not asked, and did not testify, about whether the cleaner can lower the price set by Coverall to appease a customer. The contract documents do not address that price-lowering scenario.

The evidence currently before us therefore suggests—although it is hotly disputed—that control over pricing may be a mixed responsibility, with Coverall setting the initial price and the cleaners having an avenue to raise it higher through renegotiation with the customer, but perhaps not lower. The record does not enlighten us on how feasible or frequent that right of price renegotiation is in reality.

We further add that it is long established in the law that price generally is an "essential" term of any contract. Assocs. Disc. Corp. v. Palmer, 47 N.J. 183, 187 (1966). The degree to which Coverall was the primary determinant of that essential term—in dealing with customers at the front end through its sales force—could be highly relevant to the extent of actual control it exercised over the cleaners/franchisees. In this regard, this case appears distinguishable from

21

A-0462-24

Trauma Nurses and AC&C, in which the nurses and the hot dog vendors respectively set prices on their own accord. This case is perhaps more akin to E. Bay Drywall, in which the individual installers had a right to refuse work when prices were set by the company and nevertheless were properly classified as employees. 251 N.J at 485-86.

The record is also not satisfactorily informative in resolving the degree of economic dependency these pricing arrangements have upon cleaners in meeting their revenue needs and in paying back Coverall the fees they owe (for buying the franchises). And, as we noted, the findings of the ALJ and the Commissioner are insufficient on this important subject.

Accordingly, we must remand this matter to the Commissioner (and indirectly, in turn, to the ALJ) to make more specific findings on pricing control and to ascertain how those findings affect the analyses of "conduit"/"remuneration" and the three ABC factors. The ALJ shall have the discretion to adduce more testimony on the subject to establish a more fulsome and definitive record. Pending that, we do not speculate on the subject and decline, without that ingredient, to reach any legal conclusions on the overall outcome of the ABC analysis.

A-0462-24

B.

Our review of the record further reveals that the Commissioner's final agency decision—if liability is still found to be appropriate on remand—must potentially be recalculated because of apparent errors regarding several individual cleaners who the parties singled out either in their briefs or during the appellate oral argument.

Without cluttering this opinion here with all of the underlying details, the sparse record of documents provided in the appendices and testimony appears to indicate that the cleaners with the following surnames may have been misclassified by the Commissioner under prong C of the ABC test as not having the ability or experience of engaging as independent businesses:  Genao, Lazo, and DoNato.  Although the record is not entirely clear, it appears that all three of these cleaners may have earned thousands of dollars more from non-Coverall customers in certain months or years.

Because the record does not reveal the formula the Department's auditor used to extrapolate and calculate the overall penalty, we cannot ourselves exercise original jurisdiction and make an adjusted calculation.  Consequently. the matter must be remanded for such mathematical correction.

A-0462-24

C.

For the foregoing reasons, the final agency decision is remanded for further proceedings, fact-finding, and potential recalculations, consistent with this opinion. We do not retain jurisdiction.

Remanded.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0462-24